**CHARTER MEDICAL–DALLAS, INC., Appellant,**

**v.**

**TEXAS HEALTH FACILITIES COMMISSION, et al., Appellees.**

**No. 13608.**

Court of Appeals of Texas, Austin.

July 20, 1983.

Rehearing Denied Sept. 7, 1983.

Bruce Bigelow, Wood, Lucksinger & Epstein, Austin, Glen A. Reed, Trotter, Bondurant, Miller & Hishon, Atlanta, Ga., for appellant.

Mark White, Atty. Gen., Nancy N. Lynch, Asst. Atty. Gen., Austin, for Texas Health Facilities Com'n.

Dudley D. McCalla, Heath, Davis & McCalla, Austin, for Healthcare Intern., Inc., and Crow-Wright # 2.

Earl Luna, Dallas, for Memorial Hosp. of Garland.

Before PHILLIPS, C.J., and SHANNON and POWERS, JJ.

POWERS, Justice.

Charter Medical-Dallas, Inc., sued for judicial review of certain final orders issued by the Texas Health Facilities Commission in its administration of the licensing or "certificate of need" program established by the Health Planning and Development Act, Tex.Rev.Civ.Stat.Ann. art. 4418h, §§ 3.01–3.15 (1976 and Supp.1982). The orders deny Charter Medical's application for authority to construct a new psychiatric hospital to serve portions of Dallas and Collin Counties and grant authority to two other applicants to construct similar health facilities in the same vicinity. The trial court sustained the Commission's final order in all respects. We will reverse that judgment and remand to that court with instructions to remand the dispute to the Commission for further proceedings consistent with this opinion.

The central issues raised by Charter-Medical are: (1) whether the Commission's orders are supported by adequate underlying findings of basic fact which are, in turn, supported by substantial evidence, and (2) whether the Commission acted arbitrarily or capriciously in reaching various essential conclusions which are not supported by underlying findings of basic fact.

## PROCEEDINGS IN THE COMMISSION

The statute governing the certificate-of-need program, with exceptions not material here, requires that persons wishing to establish or modify a health-care facility, or take other specified courses of action relating to such facilities, first obtain from the Commission a certificate of need that authorizes the contemplated action. Art. 4418h, § 3.01. Charter Medical, Memorial Hospital of Garland, Texas, and Healthcare International, Inc., each applied for such certificates.

Charter Medical proposed to erect a new hospital, to be named the "Dallas Psychiatric Hospital," having 75 beds and providing for adults and adolescents the following health care: inpatient and outpatient psychiatric services, emergency psychiatric services, and addictive disease treatment. Memorial proposed to convert 21 of the beds in its existing general hospital for use in a psychiatric and alcoholic rehabilitation unit. Healthcare proposed to erect a new hospital, to be named "Green Oaks, A Psychiatric Hospital," having 86 beds and providing for adults and adolescents the following health care: inpatient and outpatient psychiatric services, emergency and intensive psychiatric care, psychological casework services, together with speech, occupational, and "activities" therapy.

The Commission consolidated the three applications for the hearing required by art. 4418h, § 3.09. After such hearing, the Commission granted certificates of need authorizing the Memorial and Green Oaks projects but denied Charter Medical's application for a certificate authorizing the establishment of Dallas Psychiatric Hospital. Charter Medical brought suit for judicial review challenging the commission's actions. Art. 4418h, § 3.15; Tex.Rev.Civ. Stat.Ann. art. 6252–13a, Texas Administrative Procedure and Texas Register Act (APTRA), §§ 19, 20 (Supp.1982).

## POINTS OF ERROR

Charter Medical raises six points of error in this Court. The first four points assign the following errors:

(1) The Commission's findings of fact and conclusions of law, respecting the need in

the area for additional hospital beds, for psychiatric and addictive-disease purposes, are in certain particulars arbitrary or capricious and not supported by substantial evidence.

(2) The Commission's findings of fact and conclusions of law, respecting *other* specified criteria that govern the issuance of certificates of need under the Commission's rules, are arbitrary or capricious and not supported by substantial evidence.

(3) The Commission applied to Charter Medical certain standards that differed significantly from those the Commission applied to other applicants similarly situated, in violation of the constitutional guarantees of equal protection of the laws.

(4) The Commission's findings of fact are insufficient to support its final orders because they are, in specified particulars, set forth in statutory language but not "accompanied by a concise and explicit statement of the underlying facts supporting the findings," in violation of APTRA § 16(b).

Each of the four points of error addresses in several ways the findings of fact and conclusions of law which ostensibly support the Commission's action in denying Charter Medical a certificate of need while granting such certificates to the other two applicants.

## STANDARDS FOR JUDICIAL REVIEW

APTRA § 19(e) provides that an administrative agency's decision may be reversed only if it is:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Because Charter Medical's points of error represent an assault on a rather large front against the sufficiency of the Commission's findings of fact and conclusions of law, we should set forth what the material facts and conclusions of law are, under the certificate-of-need program, and the sources from which they derive.

Section 3.10 of art. 4418h directs that the Commission shall "promulgate rules establishing criteria to determine whether an applicant is to be issued a certificate of need" that authorizes the health-care facility he proposes to establish. The criteria must, under that section, "include at least the following:"

(1) whether a proposed project is necessary to meet the health care needs of the community or population to be served;

(2) whether a proposed project can be adequately staffed and operated when completed;

(3) whether the cost of a proposed project is economically feasible;

(4) if applicable, whether a proposed project meets the special needs and circumstances for rural or sparsely populated areas; and

(5) if applicable, whether the proposed project meets special needs for special services or special facilities.

Pursuant to such legislative direction, and utilizing its administrative expertise, the Commission has promulgated rules which govern the issuance of certificates of need. Texas Health Facilities Comm., Rules 315.19.01.010–.130, 3 Tex.Reg. 1362–64 (1978), as amended 4 Tex.Reg. 2949 (1979); now codified, as amended, as 25 TAC § 513.1–.21.[1] At the times pertinent to the present case, those rules required

---

1. The applicable rules read as follows:

.010. *Commission Use of Criteria.* The commission shall apply, as appropriate, the

following general criteria in conducting a review for a certificate of need application. These general criteria will be used in reviewing all projects.

Criteria form the basis of review by providing measures against which various aspects of the proposed project are compared. Not all criteria may be relevant in a particular case. When a project compares favorably with all of the established criteria against which it is properly measured, the applicant shall receive a certificate of need. When a project compares unfavorably with one or more of the criteria against which it is properly measured, the application for a certificate of need may be denied. The applicant should present facts and information in the application and at the hearing which address each criteria. Failure of the applicant to address all relevant criteria may result in the denial of a certificate of need application. The burden of proof is on the applicant.

.020. *Community Health Care Requirements.* The project must be necessary to meet the health care requirements of the community or population to be served. The applicant shall address at least the following:

(1) The geographical areas and population groups that will be served by the project.

(2) The barriers (*i.e.,* cultural, physical, transportation, etc.) that could affect the project.

(3) The inadequacies of existing health care delivery systems in the proposed medical service area as they relate to the proposed project.

(4) How the project will meet all or part of the perceived inadequacy in the health care delivery system in the service area.

(5) Why the applicant facility is an appropriate facility to provide the proposed project.

(6) The estimated numerical demand for the proposed project.

\* \* \* \* \* \*

.030. *Service Area Population.* The medical service area for the project must contain sufficient current and future population to require the additional facility or service. The applicant shall address at least the following:

(1) the population trends and vital rates for the county, and the HSA, and the medical service area;

(2) the accessibility of the proposed service or facility to patients in the established or proposed medical service area.

\* \* \* \* \* \*

.040. *Relationship To Existing Services and Existing Facilities.* The proposed project should not adversely affect existing facilities, existing services, or existing elements of the health care system in the medical service area (e.g., city, county, health service area). The project must not create an uneconomical or unnecessary duplication of services and facilities in the medical service area. The proposed project should integrate with the existing health care facilities and services in the medical service area. The following shall be shown as applicable:

(1) the existing or approved facilities and services in the medical service area that are similar or comparable to the proposed project;

(2) the utilization of comparable services and facilities within the established or proposed medical service area;

(3) the relationship of the proposed project to necessary ancillary or supporting services;

(4) the coordination agreements for shared services with other facilities as they relate to the project; and

(5) how the project will accomplish appropriate and effective integration with other services, facilities, and elements of the health care system in the medical service area. In addressing (1), (2), (3), (4), and (5) above, the applicant shall identify the specific site location of the proposed project within the medical service area to be served.

.050. *Less Costly, More Effective, and More Appropriate Alternative.* The project's approach to providing health care services should be less costly, or more effective or more appropriate than other methods which are available, or which have been approved to be developed. The project should integrate with the existing health care services and facilities in the medical service area. The applicant shall address at least the following:

(1) the availability of less costly or more effective alternative methods of providing such service;

(2) the availability of resources (including health manpower, management personnel, and funds for capital and operating need) for the provision of the service proposed to be provided and the availability of alternative uses of such resources for the provision of other health services;

(3) the impact of project costs on operational costs of the facility or service.

.060. *Manpower.* The applicant must have the capability of adequately staffing and operating the project. The project should not have a material adverse effect on the staffing of existing facilities and services in the medical service area. In areas of manpower scarcity, documentation shall be provided of recruitment outside the medical service area and the results of that recruitment. The application shall address at least the following:

(1) the nursing manpower, allied health manpower, and management personnel required to insure compliance with licensing or certification requirements;

(2) the physicians and physician specialties required to meet the physician staffing requirements of the project;

proof of the following before a certificate could issue to authorize a project for which application had been made:

(1) the project is "necessary to meet the health care requirements of the community or population to be served";

(2) "[t]he medical service area for the project must contain sufficient current and future population to require the additional facility or service";

(3) the project will "not adversely affect existing facilities, existing services, or ex-

isting elements of the health care system in the medical service area";

(4) the project does "not create an uneconomical or unnecessary duplication of services and facilities in the medical service area";

(5) the project "integrate[s] with the existing health care facilities and services in the medical service area";

(6) "[t]he project's [sic] approach to providing health care services [is] less costly, or more effective or more appropriate than other methods which are available,

.070. *Economic Feasibility.* The proposed project must be economically feasible. Commission consideration includes but is not limited to the following:

(1) The total project cost including at least the following:

(A) physical asset cost;

(i) site acquisition and preparation,

(ii) soil tests,

(iii) construction or changes and improvements required as a result of the project,

(iv) building or structure or office space *adquisition,*

(v) renovation,

(vi) fixed equipment,

(vii) major moveable equipment, and

(viii) energy provisions and alternatives *considered;*

\* \* \* \* \* \*

(2) The source and method of revenue to finance the project . . . .

\* \* \* \* \* \*

(4) Financial information to include audited or notarized financial statements for the most recent three years and a one-year pro forma operating budget. The financial information must include operating revenues and expenses, nonoperating revenue and expenses, net income, assets, liabilities, long-term debts, annual debt, service costs, net worth or fund balance, and other pertinent financial information, all as determined by generally accepted accounting principles, sufficient for the commission to determine at least the following:

(A) Ratio:

(i) debt ratio: net worth divided by funded debt;

\* \* \* \* \* \*

(B) What the projected breakeven operation of the project is?

(C) When will breakeven occur?

(5) What is the probable impact of the project on the cost of and charges for providing services by the applicant?

(6) The availability of funds for capital and operating requirements.

\* \* \* \* \* \*

.100. *Required Findings for Inpatient Facilities.* In the case of a proposed project requiring a certificate of need which includes the provision of health services to inpatients, the Texas Health Facilities Commission shall *not grant a certificate of need under its certif*icate of need program, or otherwise make a finding that such a proposed project is needed, unless:

(a) the Texas Health Facilities Commission *makes written findings as to:*

(1) the efficiency and appropriateness of the use of existing inpatient facilities providing inpatient services similar to those proposed; and

(2) the capital and operating costs (and their potential impact on inpatient charges), efficiency, and appropriateness of the proposed project; and (b) the Texas Health Facilities Commission makes each of the following *findings in writing:*

(1) that superior alternatives to such inpatient services in terms of cost, efficiency, and appropriateness do not exist, and that the development of such alternatives is not practicable;

(2) that in the case of new construction, alternatives to new construction (*e.g.*, modernization or sharing arrangements) have been considered and have been implemented to the maximum extent practicable;

(3) that patients will experience serious problems in terms of costs, availability or accessibility, or such other problems as may be identified by the commission, in obtaining inpatient care of the type proposed in the absence of the proposed project; and

(4) that in the case of a proposal for the addition of beds for the provision of skilled nursing or intermediate care, the relationship of the addition to the plans of the other agencies of the state responsible for providing and financing long-term care (including home health service) has been considered.

or which have been approved to be developed";

(7) "[t]he applicant [has] the capability of adequately staffing and operating the project";

(8) the "project [will] not have a material adverse effect on the staffing of existing facilities and services in the medical service area."; and

(9) the project is "economically feasible." These broadly stated proof requirements are, in almost every instance, accompanied by instructions that the applicant must "address" certain specified factual matters set out below the more general requirements stated in the opening sentences of the rule.

In applying the above criteria, derived first from the statute and elaborated in the Commission's rules, the Commission made findings of "fact" roughly categorized under the nine headings taken from its rules and quoted in part above. Footnotes four through eight illustrate that many of these findings of "fact" amount merely to recitals or summations of documentary and testimonial evidence adduced in the hearing. Nevertheless, from the findings of "fact" included under each of the nine headings, the Commission concluded that the Memorial and Green Oaks proposals satisfied all the statutory and rule-based criteria while the Dallas Psychiatric Hospital, proposed by Charter Medical, satisfied almost none of them.

In order that we may intelligently assess Charter Medical's contentions that the Commission's conclusions of law are arbitrary or capricious, and its findings of fact not supported by substantial evidence, we should first delineate the proper scope and force of these standards for judicial review, set out in APTRA § 19(e), it being apparent that there is some confusion in that regard.

Whether originating in a constitutive statute, such as art. 4418h, § 3.10, or in rules promulgated by an administrative agency, such as those set forth in footnote 1, the material factual propositions pertaining to a contested case conducted before an administrative agency may be classified, according to their inherent nature and function, as "ultimate facts," "intermediate facts," and "basic facts."

*Ultimate facts* are the most general factual determinations the agency is called upon to make when it exercises its quasi-judicial power under a constitutive statute. Consonant with the applicable rules of the Commission, and the criteria specified in art. 4418h, § 3.01, the Commission "found" in the present case that (1) Memorial and Green Oaks were "necessary to meet the health care requirements of the medical service area," and the medical service area had "sufficient current and future population to require" those proposed facilities; and, conversely, (2) Dallas Psychiatric Hospital was "not necessary to meet the health care requirements of the medical service area," and there was not "sufficient current and future population" in such area to require that proposed facility. The Commission similarly "found" in favor of Green Oaks and Memorial, and against Dallas Psychiatric Hospital, with respect to the other criteria specified in art. 4418h, § 3.01 and in the rules of the Commission.

The foregoing "findings" by the Commission are examples of ultimate facts determined by an administrative agency in a contested case. While obviously phrased in factual language, these broad postulates are easily seen as conclusions relative to legal standards, for they purport to apply in a specific case legal norms or "criteria" which are applicable in all similar cases. Such "findings" should justify the agency's final decision in the specific case, here a decision to issue certificates of need to two applicants while refusing that sought by a third applicant.

*Intermediate facts* are subsidiary factual propositions "found" by the agency in a particular case, but they also are essentially declarations by the agency that applicable, but somewhat narrower, legal norms,

standards, or "criteria" have or have not been met in the case. For example, implicit in the Commission's former Rule 315.19.01.-020 is a requirement that the applicant obtain a favorable determination relative to specified intermediate factual postulates in order that the Commission may logically "find," as an ultimate fact, that the applicant's proposed facility is "necessary to meet the health care requirements of the community or population to be served." These intermediate factual postulates are: (a) there is an existing inadequacy in health care delivery systems within the area and population to be served; (b) the inadequacy will be met in specific ways by the proposed facility; (c) the applicant is "an appropriate facility [sic] to provide the proposed project"; and (d) the proposed facility will not be adversely affected by the "barriers" listed in subsection (b) of Rule 315.19.01.020. In the present case, the Commission made findings in the language of Rule 315.19.01.-020, regarding these subsidiary matters, and in some instances it did not. For example, the Commission found that "Memorial is an appropriate facility to provide psychiatric and addictive disease care" but did not make similar conclusory declarations respecting the other subsidiary matters, preferring instead to mix them with other or more specific findings, such as:

(93) Memorial is accessible by private automobile and ambulance.

(94) No public transportation system serves Memorial's existing site.

(95) There are no other transportation, physical, or cultural barriers that would adversely affect the project of Memorial.

The mixing of findings of basic and intermediate fact, in this manner, makes it enormously difficult for a reviewing court to discern the "path" followed by the agency in its adjudication of the case. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Mutual Bldg. and Loan Ass'n v. Lewis,* 572 S.W.2d 771, 777 (Tex.App.1978, no writ). Generally, however, the office of such intermediate "facts," when they are utilized by the agency, is to furnish support for the ultimate "fact" or conclusion to which they logically refer.

■ *Basic facts* are factual determinations made by the agency in terms which are purely descriptive or predictive. They are true fact findings which "must be based exclusively on the evidence and on matters officially noticed." APTRA § 13(h). They do not purport to be declarations of norms and standards which are generally applicable in all similar contested cases conducted before the agency; rather, they purport to be determinations on factual issues made by the evidence adduced before the agency in the particular case. For example, the Commission found that "[n]o public transportation system serves Memorial's existing site"; and it found the exact number of physicians, nurses, and other categories of employees required to operate each of the three proposed health care facilities. The standard for judicial review of findings of basic fact made by an administrative agency is the "substantial evidence rule" mandated by APTRA § 19(e)(5). The issue in applying such standard is whether the record as a whole contains evidence which, when coupled with the matters officially noticed in the proceeding, provides a rational or logical basis for a particular finding of fact so that the reviewing court may presume the finding was in truth the product of reasoning from evidence.

When such basic facts are found by the agency, they establish the factual circumstances from which the agency may ascertain whether the applicable norms and standards are met. Stated another way, the intermediate and ultimate "facts," by which the agency declares whether the norms and standards are met in the particular case, are nothing more than inferences or deductions that the agency has drawn from the basic facts that have been established in the case.

■ The "substantial evidence rule" applies solely to measure the validity of the process by which the agency has inferred stated basic facts from the evidence adduced and matters officially noticed in a contested case. *That rule does not apply on judicial review to measure the rationality, and hence the validity, of the reasoning process by which the agency has deduced or inferred ultimate and intermediate "facts" from the basic facts previously found; rather, the validity of such deductions or inferences is measured by whether they are "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."* APTRA § 19(e)(6); *see generally,* 2 Cooper, State Administrative Law, 725–28 (1965). How then is the standard of APTRA 19(e)(6) applied to measure the validity of the agency's "finding" of ultimate and intermediate "facts?"

In applying APTRA § 19(e)(6) in the context of measuring an agency's "findings" of ultimate and intermediate "facts," the reviewing court is required to

> consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In comparing "the relevant factors" against the decision made by the agency as to an ultimate or intermediate "fact," while avoiding the substitution of its own judgment for that of the agency, a reviewing court must be mindful of what the agency has done, or should have done, in applying a relevant rule or standard to arrive at the ultimate or intermediate "fact" under examination: (1) the agency must have evaluated the *basic* facts *in light of* the policies which underlie the applicable rule or standard destined to be expressed in

the case as a "finding" of ultimate or intermediate "fact"; and, (2) it must have made a "finding" or determination of such ultimate or intermediate "fact" which is appropriate to or agreeable with such policies, including any accommodation required to adjust the demands of competing or contrary policies.

■ The essential meaning of the standard of review stated in APTRA § 19(e)(6), as expressed in decisions such as *Overton Park,* is that a reviewing court must defer to the agency's judgment where it has exercised its discretion in the manner just described, weighing the basic facts in light of the applicable rule or standard to arrive at a "finding" of ultimate or intermediate "fact" that effectuates the underlying administrative policies. The need for agency "expertise" is readily apparent in such matters and a reviewing court may invalidate the agency's "finding" of ultimate or intermediate "fact" only when the agency has made a *clear error* of judgment after considering the relevant factors.

Nevertheless, the record must demonstrate that the agency did in truth assess the "relevant factors" and base its "finding" of ultimate or intermediate "fact" on those considerations. In other words, the administrative order must disclose findings of basic fact sufficient to demonstrate that the particular "finding" of ultimate or intermediate "fact," and not its contrary, is correct. If the evidence establishes the existence of a basic fact that is relevant and contrary to the agency's "finding" of an ultimate and intermediate fact, the agency may not ignore this basic fact; rather, it must make *additional findings of basic fact* which demonstrate the correctness of not giving effect to the contrary basic fact—for example, that it is overcome or outweighed by the propositions expressed in other findings of basic fact. The same is true with even more force when the agency, as in the present case, has made an express *finding* of basic fact which contradicts a "finding" of ultimate or intermediate fact also made

by the agency. Such explanatory findings of basic fact are required in order for the reviewing court to "fairly and reasonably say that [the agency's findings of basic fact] support the ultimate findings of fact required for [the agency's] decision." *Railroad Comm. v. Graford Oil Corp.*, 557 S.W.2d 946, 950 (Tex.1977).

■ The foregoing shows the interrelationship between the standard for judicial review stated in APTRA § 19(e)(6) and the requirement that an agency's findings of ultimate fact be supported by reasonably sufficient findings of underlying facts. *Cf.* APTRA § 19(b). In deciding whether the agency's findings of basic fact reasonably support the findings of ultimate fact, as required by *Graford Oil Corp.*, a reviewing court must be guided by the functions of such findings of basic fact: (1) to maximize the likelihood that agency decisions in contested cases will genuinely be based upon the applicable legal rules and a proper scope given to agency discretion and expertise, (2) to apprise the parties of the grounds for agency decision so that they may properly formulate, prepare for, and join issue on the points in dispute, both in motions for rehearing filed in the agency and in any subsequent suit for judicial review; and (3) to enable the reviewing court to apply properly all of the standards for judicial review set out in APTRA § 19(e). *Miller v. Railroad Commission*, 363 S.W.2d 244, 245–46 (Tex.1962); 2 Cooper, *supra*, at 465–78; Davis, Administrative Law Text, § 16.03, at 320–22 (1972).

■ From what we have said above, it is apparent that a broadly stated contention on judicial review, to the effect that an administrative *order* or a specified finding of *ultimate* or *intermediate* "fact" is not supported by "substantial evidence," is impossible to evaluate. To measure the validity of that contention would require the reviewing court to: (1) examine *every* finding of ultimate fact to ascertain whether it is supported by adequate findings of intermediate fact and basic fact dictated by any applicable statute or rule; (2) examine *every* finding of intermediate fact to ascertain whether it is supported by adequate findings of basic fact; and (3) examine *every* finding of basic fact to ascertain whether it is supported by "substantial evidence." That character of examination would be required because it is the only way in which judicial review *could* be performed in a systematic and coherent manner, rather than in a manner which is merely intuitive, cursory, haphazard, and turbid. The courts quite obviously cannot perform such a task. They have not the manpower necessary to that task in light of the complexity and technical nature of administrative proceedings, the bulk of the pertinent records (the record of agency proceedings in the present case comprises seventeen volumes and 3,733 pages of testimony before the Commission, five large volumes of pleadings, motions, and orders, and several large boxes of exhibits), the proliferation of regulatory agencies exercising quasi-judicial power, and the corresponding increase in the number of suits for judicial review of the final orders of those agencies. More importantly, the courts have not the expertise necessary to weigh and correlate the basic facts found by an agency against the administrative policies which underlie the norms and standards applicable to the case, stated in the form of ultimate or intermediate "facts," even if it were proper for the courts to attempt such an undertaking when the legislature has placed that function in the agencies in most instances as part of their primary jurisdiction or, in some respects, their exclusive jurisdiction.[2]

---

2. Section 16(b) of APTRA became effective January 1, 1976. It provides in part that "[f]indings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." In the present case, some of the findings of fact made by the Commission are generally in the language of art. 4418h, § 3.01 and some are not. What then of the applicability of APTRA § 16(b) and its requirement of "concise and explicit" statements

To guarantee meaningful, effective, clear, and authentic judicial review of the final orders of administrative agencies, this Court in *Hooks v. Texas Department of Water Resources*, 645 S.W.2d 874 (Tex.App. 1983, writ pending) held that the party seeking judicial review must *specify* those findings of ultimate and intermediate fact which he contends are not supported by findings of basic fact, in *what respect* they do not support the findings of ultimate and intermediate fact, and *what* findings of basic fact are not supported by substantial evidence. Without such specificity, judicial review runs a substantial risk of giving only the appearance of a legal proceeding without the substance thereof. In addition, we held in *Hooks* that specificity is required in a motion for rehearing before the agency, as a condition of judicial review inferrable

from the statement in APTRA § 16(e) that such a motion is, except in emergencies, "a prerequisite to an appeal." The obvious purpose of that statutory requirement is to afford the agency a genuine opportunity to correct its errors, thereby preventing unnecessary judicial proceedings, with a consequent conservation of the limited resources of the judicial branch.

The dissenting opinion in the present case illustrates the opposite of authentic judicial review, owing to a disregard of the distinctions discussed above. In the dissenting opinion, for example, the metaphor "following the agency's path" refers not to any analytical process based upon the statutory standards for judicial review, but to an oracular process by which the nature and validity of agency action are divined through subjective and mystical perception,

of the underlying facts—are such statements required to support general findings made by an agency which are not in "statutory language?"

In *Imperial American Resources Fund v. Railroad Commission of Texas*, 557 S.W.2d 280, 286 (Tex.1977), the Court held that the Commission's order was supported by adequate findings of fact, saying: "[t]he findings are *not* set forth in statutory language, and therefore it is *not* required that they be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

However, we cannot believe that the Legislature intended that an administrative agency could circumvent the requirement (that findings of ultimate fact be supported by concise and explicit statement of the underlying facts) merely by casting its findings in terms somewhat different from those used in the applicable statute. Moreover, we note that a little over a month after its decision in *Imperial American Resources Fund*, the Court handed down its decision in *Railroad Com'n v. Graford Oil Corp.*, supra, reaffirming *Miller v. Railroad Commission*, supra, and in specific reference to APTRA, § 16(b) stating: "[t]he findings should be such that a court, on reading them, could fairly and reasonably say that they support the ultimate findings of fact required for its decision." 557 S.W.2d at 950. Most importantly, in that case, the Commission found that nine gas fields constituted a "common reservoir," in the language of the statute. 557 S.W.2d at 949. The Court thereafter treated this necessarily implied "finding" as a "conclusion." 557 S.W.2d at 951.

APTRA § 16(b) was taken virtually *verbatim* from the 1970 Model State Administrative Pro-

cedure Act § 12. The Comment to that section is pertinent where it states that

> an attempt is here made to require the agency to go beyond a mere statement of a general conclusion in the statutory language ... *or in language of similar generality.* The intent is to require the degree of explicitness imposed by such decisions as *Saginaw Broadcasting Company v. Federal Communications Commissions* (Ct.App.D.C.1938), 96 Fed.2d 554, where the Court required a statement of the basic or underlying facts. [emphasis added]

We observe, in addition, that the Supreme Court of Texas has itself indicated that whether agency fact findings are in "statutory language," within the meaning of APTRA § 16(b), is not to be determined by a mere comparison of the language used in a particular statute against that used by the agency in its findings of fact. Instead, whether the agency's findings of fact require support in underlying or basic fact findings depends on whether such are necessary to serve the purposes for which APTRA § 16(b) was designed in the particular here under discussion. *Lewis v. Gonzales County Savings and Loan Association*, 474 S.W.2d 453, 457 (Tex.1972); Shannon and Ewbank, *The Texas Administrative Procedure and Texas Register Act—Selected Problems*, 33 Baylor L.Rev. 393, 419–20 (1981). We therefore conclude that any general conclusion as to a norm and standard, applicable to all similar cases, although phrased as a "finding of fact," must be supported by concise and explicit findings of basic fact, whether or not the precise language of the conclusion is found in a statute.

precisely as a squatting witchdoctor becomes informed while sorting through animal entrails; and whether there is "substantial evidence" or sufficient "findings of fact" depends upon the bulk of the administrative record and the length of time consumed in the agency hearings! Thus a judicial phrase or buzzword becomes a talisman; wizardry or clairvoyance masquerades for the more "tedious" process of legal reasoning. The dissent focuses staunchly on the sufficiency of the *evidence* and disagrees largely on that basis; however, one should observe that we have assumed below that the evidence *is* sufficient to support the findings of basic fact made by the Commission, leaving the inquiry to be whether those findings support the Commission's findings of ultimate and intermediate fact, and therefore its final order. APTRA § 19(e)(6).

Having given our interpretation of the standards for review set forth in APTRA § 19(e), we shall apply them to the findings of fact and conclusions of law made by the Commission in the present case, in categories that correspond to the "criteria" for granting or denying certificates of need, as those are stated in the applicable rules of the Commission.

## COMMUNITY HEALTH CARE REQUIREMENTS AND SERVICE AREA POPULATION

The criteria applied by the Commission were derived from its former rules 315.19.-01.020 and .030, which read in part as follows:

.020. *Community Health Care Requirements.* The project must be necessary to meet the health care requirements of the community or population to be served . . .

\*     \*     \*     \*     \*     \*

.030. *Service Area Population.* The medical service area for the project must contain sufficient current and future population to require the additional facility or service. . . .

Under each of the two rules, the applicant was required to "address" certain subsidiary matters.

In its initial point of error, Charter Medical asserts that the Commission's findings of fact and conclusions of law, relative to the need for additional psychiatric and addictive-disease beds, are (1) arbitrary and capricious and (2) not reasonably supported by substantial evidence. The pertinent findings of ultimate fact made by the Commission were that Memorial and Green Oaks were "necessary to meet the health care requirements of the community or population to be served," but Dallas Psychiatric Hospital was not; and that the medical service areas for Memorial and Green Oaks "contain[ed] sufficient current and future population to require the project," but the medical service area for Dallas Psychiatric Hospital did not. We have detailed in a footnote the arguments of Charter Medical.[3]

3. Charter Medical contends that the necessary implication of such findings of ultimate fact is a finding that the total number of psychiatric and addictive-disease beds needed in the Dallas and Collin county medical service area was a number falling between: (1) the number of existing beds available for psychiatric and addictive disease purposes, plus the number (107) proposed by Memorial and Green Oaks together; and (2) the aggregate total of 182 beds proposed by Green Oaks, Memorial, and Charter Medical, plus the existing beds. Charter Medical contends this necessarily implied finding is not supported by substantial evidence, owing to the fact that *no* witness testified that a number of beds *within* the indicated range was the num-

ber presently needed in the medical service area. Rather, Charter Medical asserts, the *only* testimony adduced before the agency was to the effect that: (1) additional beds were needed in a number which *exceeded* such range; (2) additional beds were needed in a number which was not specified at all; and (3) no additional beds whatever were needed in the medical service area, according to the testimony of one witness. From this reference to the evidence, Charter Medical argues that the inference drawn by the Commission, as expressed in its findings of fact and conclusions of law, relating to the need for additional beds in the medical service area, is arbitrary and capricious, and

not supported by substantial evidence, under our decision in *Texas Health Facilities Comm. v. Nueces County Hospital Dist.*, 581 S.W.2d 768 (Tex.Civ.App.1979, no writ).

In *Nueces County Hospital Dist.*, we reversed the Commission's final order, denying one applicant a certificate of need for a "CAT scanner" while simultaneously granting a certificate to another applicant who sought to place the scanner in the same city. In holding the Commission's action arbitrary and capricious, we said:

> Many witnesses testified that two scanners were needed in order to properly serve the community. Several witnesses for the competing applicant admitted the need for two scanners. All of the medical witnesses who were questioned concerning the subject testified that indeed two scanners were needed. *No witness testified that only one scanner was needed.* . . . The evidence in the agency record is overwhelming that two scanners are needed. Based upon that record, reasonable minds could not have reached the conclusion that there was no need for a scanner to be placed at Memorial.

*Id.*, at 769 (emphasis added).

Charter Medical argues further that there is no evidence in the record of agency proceedings to support the Commission's use of whatever *formula* or *methodology* it employed in arriving at its implied finding relative to the number of additional beds required in the medical service area for psychiatric and addictive disease purposes, citing our decision in *Railroad Comm. of Texas v. Lone Star Gas Co.*, 611 S.W.2d 911 (Tex.Civ.App.1981, writ ref'd n.r.e.). In that case, we held an agency finding to be unsupported by substantial evidence where the agency purported to set utility rates on the basis of the agency's calculation of a rate of return which, in turn, depended upon a formula for the computation of the cost of common stock as a source of capital, and the validity of that formula was not established by any evidence. In comparison to *Lone Star Gas,* Charter Medical asserts, the Commission's implied finding of the requisite number of beds is more flagrantly invalid because the Texas Railroad Commission in the former case at least set out in its findings of fact the formula which it employed, while in the present case the formula or methodology used by the Health Facilities Commission is not revealed at all.

Finally, under its first point of error, Charter Medical challenges the sufficiency of many specific findings of fact which the Commission sets out as grounds for rejecting the testimony of two expert witnesses who gave it as their opinion that in the Dallas and Collin County area additional beds were needed, for the purposes in question, in a number which exceeded the aggregate number of beds proposed by all three applicants—Green Oaks, Memorial, and Charter Medical. In general, these findings by the Commission are to the effect that the opinions of these expert witnesses are not credible because they were shown to have been based upon the *incidence* of psychiatric disturbances and addictive disease, rather than upon the actual *utilization* of hospital facilities, or the *demand* for such facilities, for purposes of treatment.

Appellees reply to the contentions of Charter Medical, first by asserting that Charter Medical *misconceives the nature of the statutory and regulatory requirement that a proposed project be "necessary to meet the health care requirements of the community or population to be served."* According to appellees, this criterion is *not* satisfied merely by a showing that the number of beds needed in a given medical service area is greater than the total number proposed by all the applicants; rather, appellees contend, the broadly stated criterion is merely a synthesis of all the *other* criteria promulgated by the Commission pursuant to § 3.10 of the Texas Health Planning and Development Act, which criteria are incorporated *en masse* in the requirement that a proposed project be "necessary to meet the health care requirements of the community or population to be served." These other criteria refer to whether the proposed project can be adequately staffed and operated when completed, whether the cost of the project is economically feasible; and, if applicable whether the project meets special needs and circumstances of rural or sparsely populated areas; as well as the other matters specified in art. 4418h, § 3.10(c). Therefore, appellees say, the general criterion of necessity is not satisfied merely by showing that the number of beds needed in a medical service area is greater than the total number proposed by all the applicants; rather, the applicants are required to demonstrate that their projects are satisfactory in these other respects before their projects may be deemed "necessary to meet the health care requirements of the community or population to be served." They argue, in consequence, that the Commission's admitted failure expressly to find that any specific number of *additional* beds were needed in the medical service area, for the purposes in question, and any implied finding that the number was less than the aggregate proposed by all three applicants but no more than the total proposed by Memorial and Green Oaks, an implied finding not supported by any underlying or basic facts found by the Commission, are immaterial because there are, in the record of agency proceedings, sufficient findings of fact to support the Commission's determinations relative to the *other* factors. This aspect of the present case, they say, was not present in *Lone Star Gas,* which distinction is sufficient to make that decision inapplicable here.

Appellees assert, in addition, and assuming the validity of the bed-need analysis advanced by

■ We hold that the Commission's findings are arbitrary and capricious because the underlying or basic facts which might support these findings of ultimate fact are not "such that a court, on reading them, could fairly and reasonably say that they support the ultimate finding of fact required for [the agency's] decision." *Railroad Comm. v. Graford Oil Corp., supra.* That is to say, there are no findings of underlying or basic fact which support the decision of the Commission to select the projects proposed by two of the applicants while rejecting that proposed by the third applicant.

■ Charter Medical, that the evidence upon which that analysis depends was invalid because it consisted of estimates of bed need for *all* of Dallas and Collin counties while the medical service area specified in the application of Charter Medical included only designated portions of those two counties. Appellees assert that only one of the competing projects was necessary for this smaller medical service area and that the Commission properly chose Memorial over Dallas Psychiatric Hospital.

Finally, appellees represent that the Commission's finding that a need existed in the vicinity for Green Oaks and Memorial, but none existed for the Dallas Psychiatric Hospital, is adequately supported by the "real world" testimony of physicians who testified that additional beds were needed, although they did not state the quantity of additional beds that were needed. Appellees distinguish *Texas Health Facilities Comm. v. Nueces County Hospital Dist., supra,* on the ground that "[a]ll the medical witnesses who were questioned (in *Nueces County*) concerning the subject testified that indeed two scanners were needed." 581 S.W.2d at 769. In the present case, in contrast, not every witness who addressed the matter testified that the number of additional beds required equalled or exceeded the aggregate number of beds proposed by all three applicants; and at least one medical witness testified that no additional beds were needed at all. Moreover, appellees point out that the Commission was not bound to accept the bed-need estimates given by the expert witnesses upon which Charter Medical relies, and the Commission properly rejected their testimony because it was founded upon the *need* of individuals for hospitalization and not upon the actual *demand* therefor.

4. *Community Health Care Requirements and Service Area Population:*

The projects proposed by Memorial and Green Oaks are necessary to meet the health care requirements of the medical service area, and

We have set forth in footnote four the findings of basic fact which may *possibly* be interpreted as supporting the Commission's conclusions that Memorial and Green Oaks *were* necessary to meet the health care requirements under consideration, and that the medical service areas connected with their proposed establishment *did* contain adequate populations; and the Commission's contemporaneous but opposite conclusions that Dallas Psychiatric Hospital was *not* necessary to meet such health care requirements and that the medical service area connected with its establishment did *not* contain an adequate population.[4] These findings of basic fact are to the effect that

the medical service areas for the proposed projects of Memorial and Green Oaks contain sufficient current and future population to require the projects; however, the project proposed by DPH is not necessary to meet the health care requirements of the medical service area, nor is there sufficient current and future population to require the project, based on the following Findings of Fact:

\* \* \* \* \* \*

(9) From the evidence offered at the hearing, the Hearing Officer is not able to determine whether or not DPH proposes to offer long-term psychiatric care at the facility.

(10) Although there was testimony as to the average length of stay at a Charter-Medical Corporation hospital (Peachford Hospital) in Atlanta, Georgia, there was no indication that this is the projected length of stay at the proposed DPH facility (c.f. statement of an attorney for DPH: "... but the Dallas Psychiatric Hospital is not Peachford. There are differences ..." Volume III, Page 78).

\* \* \* \* \* \*

(13) DPH would not be located adjacent to a general hospital; ambulance services would be required to transfer a patient to a general hospital.

\* \* \* \* \* \*

(24) The proposed medical facility service area of DPH is the geographical area encompassing northeast Dallas County and southwest Collin County, including the following municipalities: Garland, Buckinham, Richardson, Plano, Allen, Parker, Murphy, St. Paul, Wylie, and Rowlett. (DPH Exhibit # 66).

(25) DPH estimates a 1979 population of 295,680 for its proposed medical service area.

(26) However, the bed need assessment prepared for DPH states: "... for purposes of this report, the primary service area is defined as Dallas and Collin Counties, Texas." (DPH Exhibit # 3, page 1).

\* \* \* \* \* \*

(37) James R. Vinson, Ph.D., called by Green Oaks, was qualified as an expert in the fields of demographics and mental health needs assessment.

(38) Dr. Vinson based his psychiatric bed need estimates on prevalence statistics taken from the Texas Department of Mental Health and Mental Retardation (TDMH/MR) Report of the Task Force on Prevalence and Service Requirements for Mental Health/Mental Retardation (herein "Report"), 1976.

(39) The members of the sub-committee who issued the Report relied in part upon the Midtown Manhattan Study which "suggested that 23.4% of the adult population is impaired (marked symptom formation—13.2%, severe symptom formation—7.5% and incapacitated—2.7%)" (Report, page 4).

(40) The members of the sub-committee rely upon "the Midtown and similar studies" to reach their recommendation that "10% of the adult population should be considered *in need* of professional mental health services."

(41) Harold P. Patterson, Ph.D., a health planner with the Texas Department of Health, Bureau of State Health Planning and Resource Development, was qualified as an expert in data collection, statistical analysis and bed need methodology.

(42) Dr. Patterson stated that the Report relied upon by Dr. Vinson is soft data and is not reliable.

(43) On page 7 of the Report, the sub-committee characterizes its "Service Requirements (%) of Population in Need of Mental Health Services" as "guesstimates."

(44) Dr. Vinson, however, relies upon this data to calculate his bed need projections.

(45) Page 4 of the Report states: "Studies that provide data on social class report that the highest rates of service utilization are in the lowest stratum;" Dr. Vinson does not, however, factor in this information into his projections.

(46) Dr. Vinson's theory of determining psychiatric bed need does not use historical psychiatric admission rates or episode rates as an indicator of bed need.

(47) Dr. Vinson's bed need study does not attempt to estimate patient demand for psychiatric services.

(48) Dr. Vinson's bed need study is based on "a new approach and new philosophy of treatment of mental illness," but he has done no study to determine what physicians in Dallas and Collin Counties utilize this approach.

(49) Dr. Vinson's bed need study estimates the number of private, nongovernmental psychiatric beds needed in Dallas and Collin Counties by using the average length of stay of patients in state hospitals operated by the TDMH/MR.

(50) Dr. Vinson's bed need study does not factor in the number of persons in need who are currently patients in nursing homes.

(51) Dr. Vinson projects 2,025 psychiatric beds needed in Dallas and Collin Counties in 1980, 2,115 in 1983 and 2,174 in 1985; and in HSA 5, 3,888 beds in 1980, 4,047 beds in 1983 and 4,152 beds in 1985.

(52) Dr. Vinson, however, stated that he could not make an ultimate and final recommendation of the overall beds for the treatment of mental health services in Dallas and Collin County.

(53) Because of the above-referenced weaknesses in Dr. Vinson's bed need methodology and premises, his psychiatric bed need projections for Dallas and Collin Counties and HSA 5 are not valid or reliable.

(54) George J. Warheit, Ph.D., called by DPH, was qualified as an expert in the area of epidemiology based needs assessment of mental health needs.

(55) Dr. Warheit based his estimates of psychiatric and alcoholic bed need for Dallas and Collin Counties, Texas, on data gathered from counties in Florida and Kentucky, which he extrapolated to Dallas and Collin Counties.

(56) The areas in Florida and Kentucky from which data was used for the Warheit bed need study were in the process of rapid transition from a stable, traditionally oriented, rural, agricultural community to one with a rapidly expanding economic base, shifting from rural to urban dominated power structure and experiencing racial tensions.

(57) The model county in Florida from which Dr. Warheit's other research was done in producing data used in the bed need study was Alachua County, with the principal city of Gainesville, Florida, population 125,000 to 150,000.

(58) Dr. Warheit did no field studies in Dallas or Collin Counties to estimate bed need in those counties.

(59) Dr. Warheit made no survey of the incidence of acute mental illness or alcohol abuse in Dallas and Collin Counties.

(60) The information used in his bed need study is not based entirely upon Dr. Warheit's personal research, but upon the research of several individuals.

(61) In his bed need study, Dr. Warheit used population estimates prepared by the Donnelley Marketing Company to estimate bed need for Dallas and Collin Counties.

(62) Dr. Warheit has no personal knowledge of how the Donnelley Marketing Company obtained the population data used by Dr. Warheit to project psychiatric and alcoholic bed need in Dallas and Collin Counties.

(63) Dr. Warheit did not personally calculate the population figures upon which his bed need study was based; these calculations were performed by his assistant, Joanne Buhl.

the Commission could not determine whether the proposed Dallas Psychiatric Hospital planned to offer long-term patient care, which requires a "free-standing" hospital; that Dallas Psychiatric Hospital would not be adjacent to a general hospital; that Dallas Psychiatric Hospital would be accessible only by private automobile and ambulance, and not by public transportation; that certain recreational facilities were not included in the construction costs for Dallas Psychiatric Hospital and might not be built; that there existed in Dallas and Collin counties a need for additional short-term and long-term psychiatric beds, as well as a lesser number of beds for addictive disease purposes; and that the Commission found unreliable the estimates given by expert witnesses to the effect that the total number of beds required for those counties was far greater than the aggregate number of beds proposed by all three applicants. While we assume these findings of basic fact to be supported by substantial evidence adduced in the agency hearing, taken together we may not say, without other findings of basic fact, that they fairly and reasonably support the dominant conclusion inferred from them by the Commission: that Green Oaks and Memorial were needed but Dallas Psychiatric Hospital was not. In terms of a *need* for the services proposed by the three applicants, as opposed to the other relevant factors to be discussed presently, why were Green Oaks and Memorial needed but not Dallas Psychiatric Hospital? The Commission's findings of fact and conclusions of law do not fairly and reasonably suggest the basis or theory relied upon by the Commission in distinguishing between the three

(64) Dr. Warheit's projections do not control for either the in-migration or out-migration of patients.

(65) Dr. Warheit stated that the bed need projections give no consideration to historical bed demand and utilization in Dallas and Collin Counties.

(66) Dr. Warheit's psychiatric and alcohol bed need projections were based upon the assumption of 100% occupancy of existing beds in Dallas and Collin Counties and upon the premise that a bed should be constructed and available for each and every person who has some degree of mental illness or alcoholism, regardless of whether that patient would use this bed or not.

(67) Although the Report of the President's Commission on Mental Health, cited by Dr. Warheit, estimates that 40% of persons with psychosis and 20% of persons with schizophrenia never received treatment in their lifetime, this information was not factored into Dr. Warheit's projections.

(68) Although Dr. Warheit concluded that one-third to one-fourth of the population suffering from a clinically significant disorder receive no formal treatment whatsoever, this information was not factored into Dr. Warheit's projections.

(69) Dr. Warheit's opinion that a hospital bed should be built for every person in need, as opposed to the number of persons who seek or demand care, is untenable.

(70) Gerald Flamm, M.D., points out the obvious fallacy in the premise that each person who needs psychiatric treatment must receive it, stating:

"It would not only be unusual but probably come in violation of civil rights legislation and with human rights kinds of issues because part of the problem in the mental health delivery system (is) the person doesn't want treatment. Unless you have a court order, you are not going to treat them."

(71) Because of the above-referenced weaknesses in Dr. Warheit's bed need methodology and premises, his bed need projections of an additional 1,027 acute care psychiatric and 472 alcoholism treatment beds in Dallas County and Collin County are not valid or reliable.

(74) Sufficient credible evidence was adduced at the hearing to establish need in Dallas and Collin Counties for additional short-term and long-term psychiatric beds, as well as a lesser number of addictive disease beds.

(75) There are no psychiatric or addictive disease units or facilities located in the City of Garland at present.

\* \* \* \* \* \*

(106) DPH's proposed site is accessible by private automobile and ambulance.

(107) No public transportation system serves the proposed site.

\* \* \* \* \* \*

(25) If the project were approved, the recreational amenities proposed by DPH might not be built, according to the testimony of Lawrence P. Lammers, the architect for the project.

(26) The swimming pool, shuffleboard and tennis courts are not included in the construction costs of the project.

**944**

proposed facilities on the basis of a need for psychiatric and addictive disease health care in the vicinity.

The following is said to be a "simple but fundamental rule of administrative law":

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

> [There is] an important corollary of the foregoing rule. If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

*United States v. Chicago, M. St. P. & P. R. Co.,* 294 U.S. 499, 511 [55 S.Ct. 462, 467, 79 L.Ed. 1023], . . .

*Securities and Exchange Com. v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 1760, 91 L.Ed. 1995 (1947). If the Commission believed that there was a mutual exclusivity in the three proposed health care facilities, that is, that only two of the proposed facilities were needed and not all three, and that sufficient population existed and was anticipated to support two facilities, but not three, the Commission was obligated to make findings in that regard so that its findings and conclusions could be directly tested on such grounds under the applicable standards for review. Without such underlying findings, we must hold these two findings of ultimate fact to be arbitrary and capricious. *Railroad Comm. v. Graford Oil Corp., supra.*

Our holding arbitrary and capricious the two findings of ultimate fact mentioned above is not, in itself, sufficient to require reversal of the Commission's final orders and the trial court judgment which affirms them. The Commission's rules provide that a certificate of need may not issue if the applicant fails to satisfy any *one* of the several specified criteria. Charter Medical does not contest the validity of that rule. Because the Commission found that Charter Medical failed to meet almost every such criterion, we must affirm the orders and the judgment below if any one of the Commission's several findings of ultimate fact may be sustained as valid. Stated another way, we may reverse the Commission's orders and the judgment below only if every one of the Commission's findings of ultimate fact is invalid and Charter Medical's substantial rights have been prejudiced thereby. We turn then to the other criteria which the Commission found Charter Medical failed to satisfy in the present case, expressed in findings of ultimate fact contained in the Commission's orders.

## ECONOMIC FEASIBILITY

Former Rule 315.19.01.070, promulgated by the Commission as a criterion under the certificate of need program, provided in part as follows:

> .070. Economic Feasibility. The proposed project must be economically feasible. Commission consideration includes but is not limited to the following: [there follow numerous considerations dealing with the total cost of the project, the total cost of professional services, and other matters]

Concerning the findings of fact which relate to the economic feasibility of the three proposed projects, Charter Medical contends the findings made by the Commis-

sion are arbitrary and capricious, and not supported by substantial evidence.

Charter Medical attacks first the ultimate findings made by the Commission that "the projects proposed by Memorial and Green Oaks are economically feasible; however, the project proposed by [Charter Medical] is not economically feasible." Charter Medical assails these findings by reference to evidence adduced in the agency hearings, including evidence which showed that Charter Medical has a net worth of $29 million and could expect to build the Dallas Psychiatric Hospital with cash that it has on hand; and, that it could recover the cost of the project in a reasonable time with an occupancy rate of only 48%—a rate which could be quickly achieved by the admission of addictive-disease patients alone. In contrast, Charter Medical asserts, the evidence shows that the proponent of the Green Oaks project was heavily in debt and would require a rate of occupancy higher than 48% to recover its cost in a reasonable time. Charter Medical also points to evidence showing that it is experienced in the establishment and operation of similar hospitals in other geographical areas. Finally, Charter Medical argues that certain findings of basic fact made by the Commission are

without support in the evidence, referring to the Commission's findings of fact that the occupancy rate estimated for Dallas Psychiatric Hospital was unreliable because the witnesses who gave the estimates failed to take into account the future operation of Green Oaks and Memorial, and failed as well to consider the time psychiatrists would require to establish a practice in the community.

We agree that the Commission's findings of ultimate fact (that Green Oaks and Memorial are economically feasible while Dallas Psychiatric Hospital is not) are arbitrary and capricious; we need not, therefore, consider whether any related findings of basic fact are supported by substantial evidence.

We have quoted in footnote five the findings of basic fact which may arguably support the ultimate findings that Green Oaks and Memorial are economically feasible while Dallas Psychiatric Hospital is not.[5] These findings of basic fact do not constitute a reasonable basis for the determination by the Commission that the former are economically feasible projects while the latter is not. We are, for example, unable to ascertain from the Commission's findings of basic fact the geographical area within which the question of economic feasibility

---

5. *Economic Feasibility:*
The projects proposed by Memorial and Green Oaks are economically feasible; however, the project proposed by DPH is not economically feasible, based on the following Findings of Fact:

\* \* \* \* \* \*

(25) Applicant projects breakeven for the DPH at an occupancy level of 48%, which is projected to be reached near the end of the first year of operations.

(26) However, the projections for DPH do not take into consideration the effect that Commission approval of the applications of Memorial (21 beds) and Green Oaks (86 beds) would have on DPH's occupancy levels for years one, two or three.

(27) Nor do the projections take into consideration the time required for a psychiatrist to establish a practice in a community.

(28) Currently, there is only one full-time psychiatrist in Garland, Joseph L. Black, M.D.

(29) Dr. Black had only two patients currently hospitalized at the time of the hearing.

(30) There was no indication that Dr. Black has more than two patients hospitalized at any given time.

(31) The only other psychiatrist from northeast Dallas County to support DPH's project was Howard Miller, M.D.

(32) Dr. Miller does not currently have an inpatient psychiatric practice.

(33) Only physicians admit patients to hospitals.

(34) There was no showing of sufficient physician interest in DPH to support the proposed 48% occupancy rate in year one of DPH's operations.

(35) Furthermore, the Commission grants the Memorial application, which requires only four months to commence operation, established admission patterns will already exist in Garland prior to the June, 1982, proposed completion date of DPH's project.

(36) There is not sufficient credible evidence of record to establish the projected occupancy rates of DPH or the projected breakeven.

was assessed and determined in reference to Dallas Psychiatric Hospital. As discussed above, the Commission found that there existed a "need" for some quantity of additional beds in Dallas and Collin counties for psychiatric and addictive disease purposes; and the Commission itself relied upon the proposition that such "need" is coextensive with the unsatisfied demand for such beds. Therefore, the level or extent of that "need" was an essential element in determining economic feasibility *but the level or extent of that "need" is not shown or implied in any finding of basic fact made by the Commission.* In addition, the Commission's findings of basic fact fail to disclose any reasonable basis for the Commission's implicit conclusion that such demand, when augmented by a need originating in areas outside of Garland and the medical service area specified in Charter Medical's application, would be insufficient to produce the occupancy rate necessary to render Dallas Psychiatric Hospital economically feasible. Finally, the Commission's findings to the effect that the physicians who testified in support of the need for Dallas Psychiatric Hospital did not have substantial inpatient medical practices amount merely to non sequiturs in relation to the Commission's finding on the issue of economic feasibility, at least in the absence of other explanatory findings. In view of such deficiencies, in the record as whole, we may not say that the findings of basic fact fairly and reasonably support the ultimate findings made by

the Commission relative to economic feasibility. *Railroad Comm. v. Graford Oil Corp., supra.*

## ADVERSE EFFECT ON THE STAFFING OF EXISTING FACILITIES

■ Former Rule 315.19.01.060 promulgated by the Commission provided in part as follows:

.060. *Manpower.* The applicant must have the capability of adequately staffing and operating the project. The project should not have a material adverse effect on the staffing of existing facilities and services in the medical service area. In areas of manpower scarcity, documentation shall be provided of recruitment outside the medical service area and the results of that recruitment. . . .

The Commission found the ultimate facts that all three applicants have the capability of adequately staffing their proposed projects. In addition, however, the Commission also made the findings of ultimate fact that Green Oaks and Memorial would have no "material adverse effect on the staffing of existing facilities in the medical service area," but, conversely, Dallas Psychiatric Hospital *would* have such an adverse effect. The Commission's fact findings which may arguably support the distinction drawn between the applicants are quoted in footnote six.[6]

Charter Medical complains that the above findings of ultimate fact are arbitrary and

---

6. *Manpower:*

Memorial and Green Oaks have the capability of adequately staffing and operating the proposed projects and the projects will not have a material adverse effect on the staffing of existing facilities in the medical service area; however, although DPH has the capability of adequately staffing and operating the proposed project, the project would have a material adverse effect on the staffing of existing facilities in the medical service area, based on the following Findings of Fact:

\* \* \* \* \* \*

(7) A representative of DPH testified that DPH would not seek to hire persons currently employed at other facilities.

\* \* \* \* \* \*

(9) (sic) However, sufficient credible evidence was not adduced at the hearing to establish that DPH's proposed project would not have a material adverse effect on the staffing of RN's, particularly psychiatric RN's, at existing facilities in the medical service area.

(9) At the hearing, Howard Miller, M.D., and Joseph L. Black, M.D., two psychiatrists, appeared to testify on behalf of DPH's application.

(10) Both psychiatrists engage in little inpatient psychiatric work; Dr. Miller had hospitalized one patient in the first three months of 1980, and approximately six patients in 1979, and Dr. Black had only two patients currently hospitalized.

capricious and not supported by substantial evidence. We will sustain the point of error that the ultimate findings are arbitrary and capricious.

The Commission made findings of basic fact to the effect that the vicinity of the three projects, in common with the remainder of the State, was characterized by a shortage in registered nurses. Moreover, it made findings of basic fact relative to the number of registered nurses and other personnel each project would require. However, no findings of basic fact made by the Commission logically support the Commission's conclusions that the establishment of Dallas Psychiatric Hospital will have an adverse effect on the staffing of registered nurses in existing facilities whereas the establishment of Green Oaks and Memorial will not. This is material because the findings of ultimate fact, in that connection, appear to rest solely upon one finding of intermediate fact, namely the finding that Charter Medical failed to adduce sufficient credible evidence that Dallas Psychiatric Hospital "would not have a material adverse effect on the staffing of [registered nurses], particularly psychiatric [registered nurses], at existing facilities in the medical service area." We find among the findings of fact quoted in footnote six no other which logically relates to the findings of ultimate fact to which we refer.

That the Commission bottoms its findings of ultimate fact upon a failure of Charter Medical to adduce sufficient credible evidence, to the effect that Dallas Psychiatric Hospital would have no adverse effect on the staffing of registered nurses at existing facilities, suggests of course that this factual proposition is material in determining the ultimate issue suggested by the second sentence of Rule 315.19.01.060: "the project should not have a material adverse effect on the staffing of existing facilities and

services in the medical service area." However, one observes that the Commission made no finding of fact that the establishment of Green Oaks will have no adverse effect on the staffing of registered nurses at existing facilities, even though the Commission expressly found that Green Oaks will require for its operation *more* registered nurses than will Dallas Psychiatric Hospital and both facilities are intended to be established in the same vicinity. The Commission did make a rather curious finding of basic fact that sixteen registered nurses, at a convention in McAllen, Texas, "expressed an interest in applying for positions at Green Oaks," but this tenuous proposition is offset by a similar finding that Charter Medical "would attempt to recruit [registered nurses] from its network of health-care facilities in other parts of the United States." One may not, therefore, perceive any threat of rationality leading from basic facts to the Commission's ultimate finding that Dallas Psychiatric Hospital would adversely affect the staffing and services at existing facilities, whereas Green Oaks would not, owing to the shortage of registered nurses in the vicinity and the geographical sources from which each applicant expected to draw the registered nurses required for their respective facilities. In addition, we again emphasize that we cannot evaluate a finding that there is not sufficient evidence to establish a certain *ultimate* fact, for example, that a project would not have a "material adverse effect" on staffing. This is because a reviewing court does not know what *basic* facts are essential to support such a finding of ultimate fact; therefore, we cannot determine whether the record supports the Commission's conclusion that there is not sufficient evidence to establish those basic facts or the ultimate fact inferred from them. The Commission must point out the essential *basic* facts that it believes the applicant

(11) Currently, Dr. Black is the only full-time psychiatrist in Garland.
(12) At projected occupancy rates, the active medical staff would need to consist of 3–6

psychiatrists in the first year, 5–8 in the third year and 8 10 in the fifth year.

\*　　\*　　\*　　\*　　\*　　\*

**948**

failed to establish. It may be that the Commission is able to formulate, from matters officially noticed and the evidence adduced, sufficient findings of basic fact which support the findings of ultimate fact made as to Green Oaks and Dallas Psychiatric Hospital, but these have not been expressed in the Commission's final orders and we are unable, therefore, to say that the ultimate facts found by the Commission are fairly and reasonably supported by findings of underlying fact. *Railroad Comm. v. Graford Oil Corp., supra.*

## RELATIONSHIP TO EXISTING SERVICES AND EXISTING FACILITIES

■■■ Former Rule 315.19.01.040 promulgated by the Commission provided in part as follows:

.040. *Relationship to Existing Services and Existing Facilities.* The proposed project should not adversely affect existing facilities, existing services, or existing elements of the health care system in the medical service area (e.g., city, county, health service area). The project must not create an uneconomical or unnecessary duplication of services and facilities in the medical service area. The proposed project should integrate with the existing health care facilities and services in the medical service area.... [There follows a list of factual propositions which "shall be shown as applicable"].

In findings of ultimate fact, the Commission determined that Green Oaks and Me-

morial satisfied the requirements of Rule 315.19.01.040 but Dallas Psychiatric Hospital did not. The findings of ultimate fact read as follows:

The proposed projects of Memorial and Green Oaks will not adversely affect, will not unnecessarily and uneconomically duplicate, and will integrate with existing health care facilities and services presently offered in the medical service areas; however, the proposed [Dallas Psychiatric Hospital] will adversely affect, will unnecessarily and uneconomically duplicate, and will not integrate with existing health care facilities and services presently offered in the medical service area, based on the following Findings of Fact: [There follows a list of factual propositions relative to each applicant.]

The findings of basic fact pertinent to the foregoing findings of ultimate fact, or criteria, consist of findings to the effect that: (1) Dallas Psychiatric Hospital is proposed to be erected at a point removed from any general hospital; (2) it will not be operational as early as Memorial; and (3) Dallas Psychiatric Hospital will necessarily duplicate certain specified services and facilities already offered by hospitals in the vicinity. We have set out in footnote seven the findings of basic fact which could arguably support the Commission's findings of ultimate fact.[7]

We hold the findings of basic fact do not reasonably support the findings of ultimate fact to which they refer in the Commission's final order. There are, for example,

**7.** *Relationship to Existing Facilities and Services:*

The proposed projects of Memorial and Green Oaks will not adversely affect, will not unnecessarily and uneconomically duplicate, and will integrate with existing health care facilities and services presently offered in the medical service areas; however, the proposed project of DPH will adversely affect, will unnecessarily and uneconomically duplicate, and will not integrate with existing health care facilities and services presently offered in the medical service area, based on the following Findings of Fact:

\* \* \* \* \* \*

(6) DPH's proposed service area includes certain census tracts located in Dallas and Collin Counties; however, its primary service

area in its bed need assessment is defined as Dallas and Collin Counties (cf. DPH Exhibit # 3, page 1, and DPH Exhibit # 6).

(19) Memorial can offer a complete health care system to its psychiatric patients, whereas DPH will be removed from any general hospital.

\* \* \* \* \* \*

(23) Memorial can meet immediate community needs by being operational within four months of approval by the Commission, whereas DPH will require at least a year and a half to become operational.

\* \* \* \* \* \*

(41) The granting of DPH's application, however, will create an uneconomical and unnecessary duplication of services and facilities in the medical service area.

no findings of basic fact which demonstrate that the duplicate facilities and services attributed to Dallas Psychological Hospital are "uneconomical or unnecessary," as the Commission's Rule 315.19.01.040 expressly requires. The Commission found that Dallas Psychological Hospital would have to duplicate the following services "currently offered in many hospitals in the area: EEG, EKG, laboratory, radiology and pharmacy." However, nothing in the findings of basic fact suggests the uneconomical nature of these services, if offered by Dallas Psychiatric Hospital, and nothing in such findings suggests that the duplication is unnecessary, or that the specified services are anything more than what Charter Medical contends: "a reasonable, customary and necessary aspect of psychiatric hospital operations."

Moreover, no findings of basic fact fairly and reasonably suggest the probity or rectitude of the Commission's conclusion, or finding of ultimate fact, that Dallas Psychiatric Hospital "will not integrate with existing health care facilities and services." One should think pertinent findings of basic fact were required in that regard in order to justify a finding of ultimate fact which appears facially to contradict findings of basic fact which the Commission *did* make: that Charter Medical had made specified agreements with existing health facilities respecting patient transfers and the sharing of health services. While the Commission may have valid grounds for reaching the conclusion it did, these grounds are not self-evident, and being unexpressed, we may not say the Commission's conclusion is fairly and reasonably supported by underlying findings of basic fact. *Railroad Comm. v. Graford Oil Corp., supra.*

## LESS COSTLY, MORE EFFECTIVE, AND MORE APPROPRIATE ALTERNATIVE

■ The Commission's former Rule 315.19.01.050 provided in part as follows:

> (42) In order to operate its facility, DPH would have to duplicate the following services which are currently offered in many hospitals in the area: EEG, EKG, laboratory, radiology and pharmacy.

.050. *Less Costly, More Effective, and More Appropriate Alternative.* The project's [sic] approach to providing health care services should be less costly, or more effective or more appropriate than other methods which are available, or which have been approved to be developed. The project should integrate with the existing health care services and facilities in the medical service area. The applicant shall address the following: [there follows a list of factual propositions pertaining to the subjects covered by the two sentences preceding.]

The Commission made the following findings of ultimate fact:

> The proposed projects of Memorial and Green Oaks are less costly, more effective or more appropriate than other methods which are available or have been approved to be developed, and Memorial and Green Oaks will integrate with existing health care services and facilities in the medical service area; however, the proposed project of [Dallas Psychiatric Hospital] is not less costly, more effective or more appropriate than other methods which are available or have been approved to be developed, nor will it integrate with existing health care services and facilities in the medical service area, based on the following Findings of Fact:

> \*     \*     \*     \*     \*     \*

Following the quoted statement of the Commission's conclusions, there are listed numerous findings of basic and intermediate fact.[8]

Charter Medical charges that the Commission's ultimate findings, to the effect that Green Oaks and Memorial satisfied Rule 315.19.01.050 but Charter Medical did not, are arbitrary, capricious, and not supported by substantial evidence. The only findings of basic fact which may reasonably

\*     \*     \*     \*     \*     \*

8. *Less Costly, More Effective or More Appropriate Alternatives:*
The proposed projects of Memorial and Green Oaks are less costly, more effective or more

be viewed as supporting a conclusion that Green Oaks satisfied the rule, but Dallas Psychiatric Hospital did not, are to the effect that Green Oaks will have more space per bed, and more facilities of various kinds, than would Dallas Psychiatric Hospital; and that Green Oaks will be "accessible from all parts of HSA [Health Service Area] 5 via major roadways and public transportation system, and adjacent to an established medical/surgical hospital." Against such findings, Charter Medical raises other findings of basic fact to the effect that Dallas Psychiatric Hospital would be less costly than Green Oaks: Dallas Psychiatric Hospital would cost $3 million less than Green Oaks, $28,000 less per bed, $26 less per square foot, and that Dallas Psychiatric Hospital would consequently charge $28 less per day than the amount charged by Green Oaks. From this conflict, Charter Medical argues that no findings of fact made by the Commission suggest a rationale for giving more weight to space and accessibility than to cost; or, stated another

way, the findings of fact do not establish that the space and accessibility advantages attributed to Green Oaks outweigh its much higher daily charges.

Charter Medical also contends that the criteria stated in Rule 315.19.01.050 do not require that *only* the least costly, most effective, or most appropriate proposal be approved by the Commission; rather, it contemplates that several proposed projects may be approved, even though one is cheaper, more effective, or more appropriate than another, provided a need is demonstrated for *all* the proposed projects, which Charter Medical contends is the case here. And while the findings of fact made by the Commission under the heading "Less Costly, More Effective or More Appropriate Alternatives," are almost devoid of references to Dallas Psychiatric Hospital, Charter Medical points to evidence adduced before the Commission to the effect that the services proposed to be offered by Dallas Psychiatric Hospital will be superior to those

appropriate than other methods which are available or have been approved to be developed, and Memorial and Green Oaks will integrate with existing health care services and facilities in the medical service area; however, the proposed project of DPH is not less costly, more effective or more appropriate than other methods which are available or have been approved to be developed, nor will it integrate with existing health care services and facilities in the medical service area, based on the following Findings of Fact:

(41) The following is a comparison of total gross square feet per bed as proposed by Green Oaks and DPH:

Green Oaks 53,500 ÷ 86 beds = 622 per bed
DPH 33,750 ÷ 75 beds = 450 per bed

(42) The same advantages are shown in the following additional space comparison indicated in gross square feet:

| Patient Living Units | Green Oaks | DPH |
|---|---|---|
| Total | 30,480 | 19,400 |
| Per Bed | 354 | 259 |
| Education & Activity | | |
| Total | 9,030 | 3,100 |
| Per Bed | 105 | 41 |
| Treatment/Support/Admin. | | |
| (Dining, Lab, X-Ray, etc.) | 13,990 | 11,250 |
| Per Bed | 163 | 150 |
| Total Square Feet | 53,500 | 33,750 |
| G.S.F. Per Bed | 622 | 460 |

(43) Green Oaks' physical plant, although more expensive than the other two applicants' proposed facilities, offers several advantages:

| Rooms | Green Oaks | DPH | Memorial |
|---|---|---|---|
| Patient Living Units | 5 (16 beds each) | 2 (39 & 36 beds) | 1 (21 beds) |
| Day Rooms (on living units) | 5 | 2 | 1 |
| Group Therapy | 5 (on unit) | 2 | 0 |
| Individual Therapy | 5 (on unit) | 2 | 0 |
| Intensive Care Unit | 1 (6 beds) | 0 | 0 |
| Seclusion Rooms | 5 (on unit) | 3 (central) | (converted patient room) |
| Classrooms | 6 | 3 | 0 |
| Activity Rooms/ Occupational Therapy | 3 | 2 | 1 |
| Conference Rooms | 1 | 1 | 1 |
| Therapy Offices | 5 | 3 | 0 |
| Social Center | 1 | 0 | 0 |
| Gymnasium | 1 | 1 | 0 |
| Dining | 1 | 1 | 1 |

(44) Another major cost difference is the cost of land; Green Oaks, site will cost $1,500,000, while that of DPH would be $515,000.

(45) For this difference in cost, Green Oaks obtains a location accessible from all parts of HSA 5 via major roadways and public transportation systems, and adjacent to an established medical/surgical hospital.

\* \* \* \* \* \*

offered by Memorial, although the Memorial project will be less expensive than Dallas Psychiatric Hospital.

We hold the Commission's findings of ultimate fact to be arbitrary and capricious because they are not supported by findings of basic fact which fairly and reasonably support the conclusions that Memorial and Green Oaks will *each* be less costly, more effective, and more appropriate than Dallas Psychiatric Hospital. For example, the Commission expressly found that Dallas Psychiatric Hospital was a less costly proposal than Green Oaks, though more expensive than Memorial. Therefore, at least one element made pertinent by Rule 315.19.01.-050 was found in favor of Dallas Psychiatric Hospital as against Green Oaks, but the former was denied a certificate of need while the latter was awarded such a certificate, presumably upon a basis that the latter was determined to be a more "effective" or more "appropriate" facility, or both, at least in a degree which outweighed the cost advantage of Dallas Psychiatric Hospital. We find, however, no findings of basic fact which support this rationale, illustrating the fundamentally subjective process by which the Commission orchestrated the elements of cost, effectiveness, and "appropriateness," ultimately to conclude that Green Oaks and Memorial satisfied the whole of Rule 315.19.01.050 but Dallas Psychiatric Hospital did not. While it is obvious that such orchestration is the task of the Commission, a body best equipped to judge the relative importance of cost, effectiveness, and "appropriateness," it is nevertheless the additional task of the Commission to support its conclusions with underlying findings of basic fact so that one may say its conclusions are fairly and reasonably supported. *Railroad Comm. v. Graford Oil Corp., supra.* The numerous summations of testimony set out in the Commission's order are insufficient for the purpose and the only pertinent findings of basic fact made by the Commission do not address all three elements made applicable by Rule 315.19.-01.050, much less their orchestration.

Because we have held that none of the Commission's findings of ultimate fact with respect to Charter Medical may be sustained, we must reverse the judgment of the district court which affirms the Commission's denial of Charter Medical's application. We remand that matter to the district court with instructions to remand to the Commission for further proceedings consistent with our opinion. Moreover, our remand must include the Commission's orders granting certificates of need to permit the establishment of Green Oaks and Memorial, for the reason that the Commission may have denied the Charter Medical application in whole or in part on the basis that only two of the three proposed facilities were required to satisfy the need for psychiatric and addictive disease treatment in the vicinity. If this be so, the issue must be specifically addressed and the conclusion reached directly upon findings of underlying or basic fact which fairly and reasonably support the decision to grant certificates to two of the applicants in preference to the third.

In view of the foregoing, we need not address the other points of error raised by Charter Medical.

The judgment of the district court is reversed. We remand the cause to the district court with instructions to remand the proceedings to the Commission for further proceedings consistent with our opinion.

Reversed and Remanded with Instructions.

PHILLIPS, Chief Justice, dissenting.

I hesitate to add this dissent to an already unconscionably long and tedious opinion, however I must.

It's possible, to my mind, for a court to simply *declare* that certain vital statutory elements of an administrative order are missing to such a degree as to require a reversal when, in fact, these elements, for all interests and purposes, are present and the Court is actually substituting its judg-

ment for that of the Commission. I'm afraid that's what the majority has done here.

The majority in arriving at its conclusions sets out various bits and pieces of testimony that it contends were not noticed by the Commission or applied incorrectly. Then it picks out certain findings of the Commission and faults them as either lacking substantial evidence or lacking the basic underlying findings required by APTRA § 19(e).

It must be remembered that the hearings before the Commission took 17 days. The record is as voluminous as any administrative record I have ever seen. The hearing officer's proposed findings of fact filled some 22 legal sized pages. In its order the Commission adopted the hearing officer's findings that there was no *need* for appellant's hospital then set out its findings of ultimate facts clearly supported by the above-mentioned underlying facts.

I have no problem in finding substantial evidence to sustain the order. In addition the Commission's findings in this case satisfy Section 16(b) of APTRA, Article 6252–13a, V.A.C.S. In *Texas Savings and Loan Assoc. v. Lewis,* 483 S.W.2d 359 (Tex.Civ. App.1972, writ ref'd n.r.e.) we found and upheld the required statutory findings of fact where *the path that the agency followed could be discerned.* Here the ultimate facts and the underlying facts necessary to sustain them are clearly before the Court.

It is elementary that the Commission need not accept the testimony of every expert witness appearing before it nor is it bound to notice every argument or contention submitted to it. *Gerst v. Guardian Savings & Loan Association,* 434 S.W.2d 113 (Tex.1968); *Railroad Commission of Texas v. Lone Star Gas Co.,* 611 S.W.2d 911 (Tex. Civ.App.1981, writ ref'd n.r.e.).

I might also point out that this Court has also held that an agency is justified in denying one application which does not meet the applicable criteria and in granting another application which does meet the criteria, and this is true even though the denied application asserts a statutory preference. *Strain v. Lewis,* 461 S.W.2d 498 (Tex.Civ. App.1971, writ ref'd n.r.e.).

I would affirm the judgment of the trial court.