AMTEL COMMUNICATIONS, INC., et al., Appellants,

v.

**PUBLIC UTILITY COMMISSION OF TEXAS, Appellee.**

No. 14215.

Court of Appeals of Texas, Austin.

Feb. 20, 1985.

Brook Bennett Brown, McGinnis, Lochridge & Kilgore, Austin, for appellants.

Jim Mattox, Atty. Gen., Stephen J. Davis, Asst. Atty. Gen., Austin, for PUC.

Mike Willatt, Austin, for Texas Ass'n of Telephone Answering Services.

Robert J. Hearon, Graves, Dougherty, Hearon & Moody, Austin, for Southwestern Bell Telephone Co.

Before PHILLIPS, C.J., and POWERS and GAMMAGE, JJ.

POWERS, Justice.

Amtel Communications, a supplier of telephone-related equipment, filed in the Public Utility Commission a complaint against Southwestern Bell Telephone Company, a public utility that supplies telecommunications services. In Amtel's complaint, it charged that the combined effects of Bell's tariff charges and certain of its business policies were discriminatory and anticompetitive, and therefore in violation of §§ 38, 45 and 47 of Tex.Rev.Civ.Stat. Ann. art. 1446c (Supp.1985), Public Utility Regulatory Act ("PURA"). Amtel request-

ed that the Commission amend Bell's tariffs and business policies, as necessary, to prevent the violations alleged. After a contested-case hearing, the Commission denied Amtel relief. Amtel sued for judicial review under PURA § 69. The district court affirmed the Commission's final order and this appeal ensued. We will affirm the judgment of the district court.

## THE CONTROVERSY

Amtel manufactures and sells equipment that is purchased primarily by businesses engaged in providing a telephone-answering service for telephone subscribers. Among such equipment is a "concentrator." This article, when connected to link the telephones of a subscriber and his answering service, through Bell's telephone system, causes the telephones of the answering service and subscriber to ring simultaneously. After three rings, the absent subscriber's telephone may therefore be answered by his answering service. While Amtel successfully sells its concentrator in other States, it has been unsuccessful in selling them for use in Texas, owing, it is said, to the discriminatory and anti-competitive practices now to be described.

Bell owns and rents to answering services a make of concentrator it purchases from "Western Electric." Bell and Amtel thus compete in supplying concentrators to businesses that provide an answering service. Under Bell's business policies, it installs its concentrators adjacent to the "main frames" located in its central offices. Because of this proximity, only very short connecting lines ("bridges") are required to connect the telephones of the subscriber and answering service through Bell's telephone system. On the other hand, another of Bell's business policies will not permit to be installed inside Bell's central offices any concentrator that Bell does not itself own and service. Consequently, if a telephone-answering service chooses to buy and use a concentrator supplied by Amtel, in lieu of renting one supplied by Bell, various and lengthy lines must be put in place *outside*

the central office housing Bell's "main frame." The cost of doing so must be borne by the answering service electing to use an Amtel concentrator; but the cost does not arise at all if the answering service elects to rent a concentrator supplied by Bell, for no external lines need be installed in that case.

Whether the shorter internal lines are utilized for installation of a Bell concentrator, or the longer external lines required for an Amtel concentrator, the lines are put in place by Bell. Under Bell's tariff, on file with the Commission, the company is entitled to recover for the installation a sum determined by the length of line installed. Similarly, under the tariff Bell is entitled to recover for *use* of the lines a sum determined by their length. In the words of the parties, the charges for installation and use of the lines are therefore "distance sensitive" and work to increase considerably the cost of installing and using an Amtel concentrator, owing to the much longer external lines required for that make.

In summary, Amtel's concentrator may be used by an answering-service enterprise only if it is willing to bear the much higher cost associated with the installation and use of a concentrator supplied by Amtel. The result, of which Amtel complains, is a distinct competitive advantage enjoyed by Bell in supplying its make of concentrator to the answering-service market.

It is argued by Amtel that Bell's competitive advantage may be terminated in either of the following ways: (a) revising Bell's tariff charges to delete therefrom the "distance sensitive" charges, permitting instead a system of artificially equal charges for all makes of concentrators, a remedy the parties refer to as "parity"; or (b) requiring a change in Bell's business policies to permit concentrators not owned by Bell to be installed in its central offices adjacent to the "main frame", or perhaps requiring Bell to install its concentrators outside its central offices. These were urged as alternative remedies in the administrative proceedings we now review.

## THE ADMINISTRATIVE PROCEEDINGS

After Amtel filed its complaint against Bell, the latter filed in the Commission a request that its tariffs be revised in certain particulars, including a request by Bell that the Commission establish a "parity" of pricing for the installation and use of the lines associated with concentrators, whatever their make. This independent proceeding was consolidated with that initiated by Amtel's complaint. After hearing, the Commission sustained Bell's request for tariff revisions, save for the "parity" pricing request, and denied Amtel relief under its complaint. Finding no violations of PURA §§ 38, 45 and 47, the agency refused to alter the "distance-sensitive" charges associated with the installation and use of concentrators; and, it refused to order a change in that aspect of Bell's business policies which permits only its own concentrators to be installed in its central offices adjacent to the "main frame."

The Commission's decision was based upon findings of fact and conclusions of law set forth and adopted in the Commission's final order. These may be summarized broadly as follows: (1) Bell's exclusionary policy rests upon valid business grounds and decisions with which the Commission should not interfere; (2) the cost-based system of "distance-sensitive" charges should not be revised in favor of "parity" owing to certain practical difficulties that make "parity" pricing unreasonable; and (3) under "parity" Bell would be permitted either an excessive recovery or an insufficient recovery. The latter theory—that Bell would recover too much or too little under "parity"—is apparently based upon a rationale that Bell's actual costs are unequal for the two classes of concentrator; therefore, the actual sums recoverable by Bell under a system of artificially equal charges ("parity") would allow Bell a sum far in excess of its lawful rate in the case of its own concentrators, and far below its lawful rate in the case of other makes of concentrators. The agency's findings, here summarized, will be discussed below at greater length.

## THE COMPETING PUBLIC POLICIES OF PURA

To properly understand Amtel's contentions on appeal, and our resolution of those contentions, it is essential to observe that PURA embodies distinctly contrary public policies which the Commission is charged to effectuate in its administration of that statute.

First, PURA requires that the Commission implement a public policy that the monopoly power of a public utility shall be held only under State license and exercised under State regulatory control. The statute requires, concurrently, that the agency implement a contrary public policy in favor of competition. Second, the Commission must under PURA implement a public policy against discrimination in utility services while, in some instances and in some degree, the agency may implement a policy of discrimination based upon the public interest.

These competing public policies are, in the present case, interwoven to a substantial degree. Their accommodation or adjustment is, of course, a matter charged initially and primarily to the special knowledge, experience, discretion, and well-considered policies of the Commission as it pursues all the legislative purposes implicit in PURA. *See generally* Patillo & Fields, *Antitrust and PURA: Look Before You Leap!*, 28 Baylor L.Rev. 1029 (1976); Zimmerman, *Overview: Competitive Principles in Regulated Industries*, 39 Antitrust L.J. 427 (1970); Hale & Hale, *Competition or Control V: Production and Distribution of Electric Energy*, 110 U.Pa.L.Rev. 57 (1961). Although the various public policies are interwoven in the present case, we shall separate them for purposes of discussion.

### Monopoly Power vs. Competition

The regulatory powers granted the Commission under PURA are quite extensive and are based upon the political decision that various utility services shall be sup-

plied the public under a government-regulated monopoly system (§ 2). The Commission's power extends to the fixing of just and reasonable rates for such services (§§ 38, 39), which itself necessitates that the Commission "fix proper and adequate ... methods of depreciation, amortization, or depletion of the several classes of property of each public utility" (§ 27(b)). The agency's power extends further to such matters as the fixing of standards, classifications, regulations, and practices dealing with the supplying of utility services (§ 35(b)); the general power "to ensure compliance with the obligations" of public utilities as set out in PURA (§ 37); the issuance of certificates of convenience and necessity, authorizing the rendition of utility service after considering certain factors (§ 54); the power to disallow a public utility's sale of its property or its contemplated merger with another public utility, depending upon where the Commission determines the public interest lies (§ 63); and the power to cause the attorney general to enforce, by civil penalties or injunctions, any violation by a public utility of the prohibitions contained in PURA, or in any rule, regulation, or order promulgated by the agency (§§ 72–77).

The central assumption that utility services shall be provided under a publicly controlled monopoly is justified in PURA § 2, where it is stated that a public utility is, "by definition", a monopoly in respect of which "the normal forces of competition" do not operate to regulate the utility's prices and practices, necessitating that regulatory control "substitute for such competition." Consequently, the rates charged by a public utility are fixed not by it but by the Commission, and it is unlawful for the utility to charge, collect, or receive any sum except that allowed by the legal or official rate set by the Commission (§ 27). Similarly, the utility's services, instrumentalities, and facilities must be "safe, adequate, and reasonable" according to what the Commission fixes as "just and reasonable" (§ 35(a)). The central theme logically requires that competitive forces not be permitted to derange the official regulatory

system of control. It is accordingly provided that the Commission may not issue a certificate of convenience and necessity to another public utility without first considering and assessing the effect such issuance might have "on any public utility of the same kind already serving the proximate area...." (§ 54(c)).

On the other hand, PURA contains other provisions that are distinctly "antitrust" in nature and reflect a definite public policy *in favor of competition* as a regulating or controlling force applicable to public utilities. In these particular instances, it is plain that PURA does *not* insulate a public utility from the forces of competition and, indeed, prohibits anticompetitive practices by the utility. For example, in the case of telecommunications utilities, PURA provides as follows in § 18:

(a) It is the policy of this state to protect the public interest in having adequate and efficient telecommunications service available to all citizens of the state at just, fair and reasonable rates. The legislature finds that the telecommunications industry through technical advancements, federal, judicial and administrative actions, and the formulation of new communications enterprises has become and will continue to be in many and growing areas a *competitive industry which does not lend itself to traditional public utility regulatory rules, policies, and principles; and that therefore, the public interest requires that new rules, policies, and principles be formulated and applied to protect the public interest and to provide equal opportunity to all telecommunications utilities in a competitive market place. It is the purpose of this section to grant to the commission the authority and the power under this Act to carry out the public policy herein stated* (emphasis supplied).

And in reference to *all* public utilities coming within the terms of the statute, § 47 of PURA specifically provides as follows:

No public utility may discriminate against any person or corporation that

sells or leases equipment or performs services in competition with the public utility, *nor may any public utility engage in any other practice that tends to restrict or impair such competition* (emphasis supplied).

■ Given these rather definite and clear pronouncements of competing policies, it cannot reasonably be doubted that the Legislature intended the Commission to make, where necessary and desirable in the particular case, whatever adjustments and accommodations it considers necessary to effectuate the public interests underlying *both* competition and monopoly power. They may conflict in the process of considering the issuance of a certificate of convenience and necessity under § 54; in the process of regulating "operations" and "services" under § 18(b); in enforcing the prohibition of § 47 through an action by the attorney general under §§ 71 and 72; or they may arise, as in the present case, in the complaint process authorized by § 83 of PURA, where they are interwoven with Bell's request for a revision of its tariffs. In whatever context they arise, it is the Commission's task to assess the competing policies and decide where the *public* interest lies, for nothing in PURA suggests a legislative intention to protect any utility's *private* interest against competition.

*Discrimination vs. Equal Treatment*

■ In a similar way, PURA demonstrates a central purpose that the Commission shall generally effectuate a public policy against discrimination, particularly in basic utility services. Other provisions imply, on the other hand, that in some circumstances discrimination may be in the public interest and there is, in such circumstances, actually a public policy in favor of discriminatory practices by a public utility regulated under the statute, even with regard to basic utility services.

There can be no doubt that PURA embraces the time-honored public policy *against* discrimination by a public utility in the services it provides. This is clearly seen in § 38 which provides as follows:

It shall be the duty of the [Commission] to insure that every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable. Rates shall not be unreasonably preferential, prejudicial, or *discriminatory*, but shall be sufficient, equitable, and consistent in application to each class of consumers (emphasis supplied).

In § 42, it is provided that the Commission, if it finds that a utility's rates are discriminatory and therefore "in violation of [a] provision of law," shall determine a just and reasonable rate, to be thereafter the legal rate the utility may charge. Under § 45, a public utility is prohibited from making or granting "any unreasonable preference or advantage to any corporation within any classification, or subject any corporation or person within any classification to any unreasonable prejudice or disadvantage"; and, moreover, a public utility subject to PURA may not maintain or establish "any unreasonable differences as to rates or service either as between localities or as between classes of service." Finally, § 47 provides that a public utility may not "discriminate against any person or corporation that sells or leases equipment or performs services in competition with the public utility. . . ."

■ On the other hand, it is implicit in the Commission's power of *reasonable* classification granted in section 37, among other provisions, that *some* degree of discrimination may be in the public interest in *some* circumstances; and in such instances unequal treatment is neither a violation of PURA nor a basis for invalidating agency actions and decisions. For example, in the matter of public utilities providing telecommunication services, the Commission must under § 18 decide *when* "traditional public utility regulatory rules, policies, and principles" do not lend themselves to regulating a competitive aspect of the operations, services, or practices of those particular utilities. Under §§ 37, 38, 40 and 45, the Commission must decide *when* different rates, preferences, or advantages become *unrea-*

*sonable* as between classes or within a class, and therefore unlawful. Under § 44, the Commission must decide *when and under what conditions* it will approve a difference between municipal and rural rates in excess of the 115% differential set by that section.

 The antidiscriminatory principle is not only statutory, it is a common law principle as well. *City of Texarkana v. Wiggins,* 151 Tex. 100, 246 S.W.2d 622 (1952). *But the principle includes a permissible range of unequal treatment which, while literally discriminatory, is not unlawfully so.* The dividing line is generally that drawn by the rule of reasonableness, for mere inequality is not itself unlawful discrimination. That is to say, the different treatment practiced by the public utility must be founded upon a substantial and reasonable ground of distinction between the favored and disfavored classes or individuals. *United Gas Corporation v. Shepherd Laundries Co.,* 144 Tex. 164, 189 S.W.2d 485 (1945). The ground of distinction may rest upon such factors as:

> the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction.

*Caldwell v. City of Abilene,* 260 S.W.2d 712, 714 (Tex.Civ.App.1953, writ ref'd), quoted with approval in *Texas Alarm & Signal Ass'n v. Public Utility Comm'n,* 603 S.W.2d 766, 772 (Tex.1980). "There is no rule of thumb by which to determine whether the conditions of utility service are similar or dissimilar. It is a question of fact to be determined from the testimony in each case, and the burden of proof is on the complaining party." *Ford v. Rio Grande Valley Gas Co.,* 141 Tex. 525, 174 S.W.2d 479, 480 (1943).

Within the range of possible distinguishing factors, there is included to some extent the achievement of social policies through utility regulation. In *Ford v. Rio*

*Grande Valley Gas Co., supra,* the regulatory authority (a city) was permitted to make a valid distinction when it included canneries among its class of low-rate customers for the purpose of attracting new industry to the city. Notwithstanding a statutory prohibition against rate discrimination between consumers similarly situated or receiving the same kind of service, it has been held or recognized that a public utility may validly discriminate in favor of low-income or elderly persons. Rosenhouse, *Public Utilities: Validity of Preferential Rates for Elderly or Low-Income Persons,* Annot., 29 A.L.R.4th 616–18 (1984).

In addition to the rates charged by a utility for its services, discrimination may possibly be found in certain other practices of the utility wherein it may depart from the standard of impartial treatment. These practices include the utility's granting exclusive rights and privileges within the scope of its public duties; its requiring security deposits of some customers, but not all; and its affording different treatment in extending credit. *See generally* 64 Am.Jur.2d *Public Utilities* §§ 38–41 (1972). The various practices may or may not constitute *unlawful* discrimination according to the facts of the case. *Id.*

 In any case, the validating or invalidating criterion is generally that of *reasonableness* applied to the distinguishing feature relied upon as a justification for departing from equal treatment. Under PURA, the Commission is entitled to make the first evaluation, subject to judicial review, in an exercise of its judgment, special knowledge, and experience. *Texas Alarm & Signal Ass'n v. Public Utility Comm'n, supra,* at 772–73.

 Implicit in all of the foregoing is this: the principles of monopoly, competition, equal treatment, and discrimination are not absolute, but only relative and abstract principles evidencing competing public policies which PURA implicates in varying ways in the several functions of the Commission, such as ratemaking, the is-

suance of certificates of convenience and necessity, and the enforcement of the mandates or prohibitions contained in PURA or in the rules or orders of the Commission. Such principles acquire meaning only in a particular factual context. It is not enough simply to show that a given utility practice results in unequal treatment. Bearing in mind these propositions, we turn to the specific points of error assigned by Amtel in the present appeal.

### AMTEL'S POINTS OF ERROR

1. *The findings of fact upon which the Commission's final order rests are insufficient in that they do not include findings on the statutory criteria dispositive of the issues raised in the agency proceedings.* Amtel argues that the set of fact findings made by the Commission do not include findings responsive to the criteria implicit in PURA §§ 38, 45 and 47. We shall first state the criteria as we understand them.

Section 45 prohibits unreasonable discrimination by a utility as to rates or services and forbids a public utility to subject any corporation or person "to unreasonable prejudice or disadvantage." It is, in our view, primarily a prohibition against discriminatory practices by a public utility in the matter of rates or services.

■ Section 47 forbids discrimination by a public utility against competing suppliers of equipment or services *and* prohibits "any other practice that tends to restrict or impair such competition." In our view, this section is rather plainly a prohibition against discrimination or any other practice that tends to restrict or impair competition between a public utility and the supplier of competing equipment or services. It is, therefore, primarily an antitrust provision applicable in the area of competing equipment and services, which may lie outside the area of basic utility services.

Section 38 imposes upon the Commission a duty to insure that its rates are just and reasonable and not unreasonably discriminatory. It is, therefore, primarily a standard applicable to the Commission in its setting of the rates permitted to be charged by a public utility.

Amtel complained to the Commission that Bell had, by the combined effect of its tariff rates and its business policies relative to concentrators, violated §§ 45 and 47; and if the Commission allowed Bell to maintain the discrimination or competitive disadvantage suffered by Amtel, in the tariff amendments requested by Bell, the Commission would violate its duty under § 38 to insure that Bell's rates were just and reasonable and not unreasonably discriminatory.

From PURA §§ 38, 45 and 47, we therefore infer the following "criteria" to which Amtel refers in its contention that they should have been the subject of agency findings of fact: (a) whether Bell's exclusionary policy and its tariff rates constituted unreasonable discrimination (§ 45); (b) whether they constituted an unlawful restriction or impairment of competition (§ 47); and (c) whether the "distance-sensitive" charges permitted Bell resulted in rates that were unjust, unreasonable, and unreasonably discriminatory (§ 38).

The Commission's final order includes the following under the heading "conclusions of law":

(a) There was under the evidence adduced a reasonable basis for the difference in "rates" associated with the respective makes of concentrator. (Presumably the word "rates" refers to the *charges* permitted by Bell based upon length of line installed and used, derived from the rate applied thereto.)

(b) "The evidence ... shows that [Bell] has legitimate reasons for refusing open access to its central offices."

(c) The disparity in charges occasioned by Bell's exclusion policy and the "distance-sensitive" charges permitted by its tariffs do not "indicate" a violation of PURA §§ 38, 45 or 47, or any other provision of PURA.

(d) The "rates" charged the answering service for either make of concentrator,

and those charged "the ultimate customer," are "cost-based."

(e) "Setting rates at parity in this case would result in unreasonable rates which would discriminate against a class of customers by charging the class more than a service is worth."

(f) "To the extent parity pricing is allowed, it is inevitable that [Bell] will either under or overrecover its costs, and certain customers will pay more than their fair share, or will be subsidized by other customers...."

(g) If parity pricing is allowed, Bell "will also under or overrecover its authorized rate of return, which is prohibited by Sections 39 and 40(a) of" PURA.

(h) The portion of Bell's proposed tariff amendment requesting that "rates be set at parity for recurring charges is unreasonable, causes discrimination between classes, is not based on costs, and should be rejected ..."; and, it "is unnecessary and improper because of the previous conclusions of law that rates need not be set at parity in this docket."

The foregoing are obviously findings of ultimate fact quite properly classified by the Commission as "conclusions of law."

Under the heading "findings of fact", the Commission's final order sets forth the following, among others:

(a) Bell's exclusionary policy is justified by reasons of "security, control over persons not employed by [Bell] who may not be properly trained, damage to equipment caused by these employees, work rules dealing with safety, and fire codes"; and the cost of overcoming these should be borne by the customer providing a concentrator to be installed in a Bell building.

(b) The "Commission should neither require nor prohibit [Bell] from permitting the location of customer-owned concentrators or other equipment in [Bell's] buildings in order to leave the matter open for negotiation during the period of divestiture."

(c) "If parity pricing were to be required in this case, it would be necessary to establish a 'phantom' rental rate so as to treat all equipment as if it were the same."

These conclusory inferences, while denominated "findings of *fact*," appear rather plainly to be findings of *ultimate* fact because they too clearly imply the Commission's exercise of "discretion or judgment ... based on a multitude of factors." *Lewis v. Gonzales County Savings and Loan Ass'n*, 474 S.W.2d 453, 457 (Tex.1971). That is to say, they imply judgments reached by the agency as to the validity of Bell's exclusionary policy, whether the Commission should interfere with that policy, and why "parity" should not be ordered as a remedy to the complaint made by Amtel.

From the totality of these findings of ultimate fact, whatever the heading employed, it is evident that the Commission assessed and acted upon the statutory "criteria" we have extracted from PURA §§ 38, 45 and 47. In other words, it is manifest that the Commission *did* assess the criteria of (1) unreasonable discrimination, (2) anticompetitive practices, and (3) unjust, unreasonable, and unreasonably discriminatory rates, to conclude ultimately that no violation of PURA §§ 38, 45 and 47 was "indicated."

Nevertheless, we agree that these findings by the Commission do suggest, in our inexpert view of the matter, some defects in reasoning by the agency. For example, we do not understand the finding that "parity" rates would either prevent Bell from recovering its costs or enable it to recover more than its costs. As we understand the theory of "parity" as advanced by the parties, it *would* allow Bell to recover the *aggregate* of its *actual* costs, notwithstanding that any artificially equal charges assigned both makes of concentrator might be high or low as compared to Bell's actual cost for installation and use of a particular make. The same may be said of the Commission's finding that "parity" charges would be "unreasonable." It can be so only in relation to some assumed premise or standard that is not stated explicitly as the basis for that conclusion. And when

we look at the findings of *basic* fact made by the agency and set forth in its final order, we find very little indeed to support the Commission's judgmental inference that an artificially equal charge is bad administrative policy in the circumstances and why it would result in unreasonably discriminatory rates "by charging [a] class more than a service is worth," as opposed to what the service costs. The word "worth" implies a value judgment, of course, in comparison to a standard that is not stated. We particularly do not find in the order any findings of basic fact suggesting a fair and reasonable support for the intriguing conclusion that the "Commission should neither require nor prohibit [Bell] from permitting the location of customer-owned concentrators or other equipment in [Bell's] buildings *in order to leave the matter open for negotiation during the period of divestiture*" (emphasis added). This conclusion suggests that the agency's deference to Bell's policy is in the nature of a temporary expediency not described in the agency's findings of basic fact.

In light of such defects, we would prefer at this point to remand the case to the agency in order that it might exercise its discretion, experience, special knowledge and administrative judgment in resolving these apparent defects in the set of ultimate facts which it found and upon which it apparently based its decision in the case. We are not reasonably satisfied that the Commission would have made the same decision based upon its remaining findings of ultimate fact.

We do not, however, write on a clean slate. We must explicitly and in good faith attempt to follow the precedent set by the Supreme Court of Texas in *Texas Health Fac. v. Charter Medical-Dallas*, 665 S.W.2d 446 (Tex.1984), even though we do not approve the reasoning and result of that opinion. An explanation is required.

The transcending aspects of the controversy in *Charter Medical* were that three applicants sought the agency's authorization to erect and operate a health-care facil-

ity; each facility was proposed to be erected in the same vicinity north of Dallas; and all three proposed to provide substantially the same health-care services. Under applicable law, the agency was required to evaluate the competing applications by reference to five criteria: (1) whether the area population and health-care requirements demonstrated a "public need" for the proposed facility; (2) the economic feasibility of the proposed facility; (3) its relationship to existing services and facilities; (4) whether it would affect adversely any existing facility; and (5) whether there existed less expensive, more effective, or more appropriate alternatives to the proposed facility. *See Charter Medical-Dallas v. Texas Health Fac.*, 656 S.W.2d 928, 931–34 (Tex.App.1983), rev'd 665 S.W.2d 446 (Tex. 1984).

The agency determined that the facilities proposed by two of the applicants satisfied every criterion, but that the facility proposed by Charter Medical satisfied none of them. In its review of the grounds for such determinations, as expressed in the findings of fact made by the agency, the Supreme Court expressed doubt that the findings were sufficient to sustain the agency's conclusions on four of the five criteria as they related to its decision refusing to authorize the Charter Medical facility. 665 S.W.2d at 453. Nevertheless, the Supreme Court sustained the agency's decision because it felt that seven of the agency's 213 findings of fact relating to the criterion of "public need" justified *by themselves* the agency's determination that no such need existed for the facility proposed by Charter Medical. Only three of the seven findings of fact referred to by the Supreme Court were thought *by the agency* to relate to the "public-need" criterion: that the Charter Medical facility would not be near a general hospital; that it would be accessible only by private automobile and ambulance, but not public transportation; and that the "recreational facilities" which would form a part of the facility might not be built. *Cf.*, 665 S.W.2d at 453 and 656 S.W.2d at 939–44. The remaining four findings were: the Charter Medi-

cal facility would not be near a general hospital; the evidence did not show a physician interest in the Charter Medical facility "similar to the interest expressed in the other two facilities ..."; the Charter Medical facility would duplicate the services of the other two facilities if they were authorized; and the projected occupancy rates for Charter Medical were not supported by competent evidence. 665 S.W.2d at 453. These four findings, *in the opinion of the agency,* bore not upon "public need" but upon the criteria of economic feasibility and the relation of the proposed facility to existing facilities and services. 656 S.W.2d at 945, 948.

The Supreme Court obviously considered the agency order to have serious logical deficiencies. Nothing in the agency order explained the apparently contradictory findings of ultimate fact that a "public need" existed for the two favored facilities but *not for the third,* when all three were proposed to offer the same services in the same vicinity. 665 S.W.2d at 452, 453. The Court's examination of the agency's findings of ultimate fact relative to the *other* four governing criteria resulted in grave doubt that these could support the agency's decision. 665 S.W.2d at 453. Only three of the 213 findings of basic fact which bore upon "public need" were considered valid by the Court, along with four others which the Court felt could relate to "public need" even though the agency felt they bore upon other criteria. The Court chose, nevertheless, not to remand the case but to *affirm* the agency order on a basis that the Court itself could construct a saving rationale from the seven valid findings of basic fact alone. *Id.* This necessarily overruled the holding of the Court of Appeals that a reviewing court could not affirm the order on such a basis; and it abrogates several generally accepted rules that apply to the judicial review of an administrative order which embodies a decision that the agency alone is authorized to make under applicable law—for example, a determination to issue a license, to set a

utility rate, or to act on a complaint about utility services.

The first such rule is that a reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Securities and Exchange Com. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1946). If *those* grounds are improper, the reviewing court may not uphold the agency order on a theory that the agency's determination may be sustained on valid grounds not invoked by the agency in its order—for example a fragment of its findings of fact or a theory not expressed in the order. For the court to affirm the agency order on grounds or a theory not expressly invoked by the agency constitutes an intrusion by the court into the exclusive domain of the agency, that is, its right and duty to make the relevant determinations on grounds and a rationale considered sufficient *by the agency. Id.*

■■■■ The second rule is a corollary of the first. The agency's order must clearly and explicitly set forth the ground upon which its determinations is based so that a reviewing court may know and understand that basis.

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M. St. P. & P.R. Co.,* 294 U.S. 499, 511 [55 S.Ct. 462, 467, 79 L.Ed. 1023] ...

*Securities and Exchange Com. v. Chenery Corp., supra,* at 196–97, 67 S.Ct. at 1577–78. *See generally* Davis, Administrative Law Text §§ 16.05–16.07 (1972).[1]

---

**1.** It is, for several reasons, an obvious truism that a reviewing court "has neither the right nor

the authority to lay out a *precise* form of findings to be made by" an administrative agency in

The agency order being *silent* as to the grounds upon which the agency acted in finding a "public need" for two of the facilities, but not the third, when all were proposed to provide substantially the same services in the same vicinity, the Supreme Court was not, under the general rule, free to supply the missing rationale. But it necessarily did so—and without revealing what the rationale was. Moreover, the Court's essential method of review in *Charter Medical* is unquestionably to the effect that the agency order must be upheld if the reviewing court is able to construct from any of the agency's *individual* findings of fact any ground or set of grounds which *the court* believes sufficient to "support" in a general way the determinations reached by the agency, even though the agency's order does not clearly and explicitly state those grounds or rationale in a way that is sufficient for the reviewing court to understand them, even though those "supporting" grounds be only a fragment of the whole set of grounds upon which the agency acted in the case, and even though other of the correlative grounds upon which the agency acted are of doubtful validity. We shall, therefore, attempt to apply in our evaluation of the present appeal the rather generalized style of judicial review laid down by the Supreme Court in its *Charter Medical* opinion. We nevertheless respectfully request the Supreme Court to reassess its views in these matters for they are of supervening importance to judicial review of the orders of Texas administrative agencies.

Turning to the particulars of Amtel's first point of error, we observe that it is incorrect of Amtel to say that the Commission's final order does not *include* findings on the statutory criteria implicit in PURA §§ 38, 45 and 47. The Commission indeed *expressly* found that the prohibitions and requirements of those statutory provisions were *not* violated. Moreover, the general tenor of the remaining findings of ultimate fact is to explain in greater detail the validity of that conclusion.

Implicit in what we have said above is the proposition that the antidiscrimination and antitrust provisions of PURA are not absolute; nor, of course, are their opposites. Here, the Commission's findings of ultimate fact apparently reflect an agency theory, policy, or conclusion that the discrimination and competitive disadvantage suffered by Amtel are not unreasonable or unlawful *in light of other factors* clearly implicit in the findings made by the Commission:

(a) "Parity" is not an acceptable remedy for the discrimination and competitive disadvantage suffered by Amtel because it would, in the Commission's judgment, result in rates that are unreasonable, discriminatory, excessive, or insufficient with respect to one or the other class of concentrator users;

(b) The Commission should not interfere in regard to Bell's exclusionary policy in order to leave the matter "open for negotiation during the period of divestiture";

a contested case. *Texas Health Fac. v. Charter Medical-Dallas, supra,* at 452 (emphasis added). But this truism cannot mean that a reviewing court is entirely powerless with regard to the content of an agency's final order when it is made the subject of a suit for judicial review. The reviewing court must have at minimum the power to require that an agency's findings of fact and conclusions of law be set out in a manner that is *understandable* to the court, which is probably not technically trained in the area of the agency's expertise and experience, and *sufficient* to enable the court to perform its statutory duty of judicial review. The latter most often includes, of course, the court's task of deciding: (1) whether the agency *could* have inferred its findings of basic fact from the evidence adduced in the agency and included in the record as a whole; and (2) whether the agency's findings of basic fact *fairly and reasonably support* its conclusions of law. Unless the reviewing court has this limited power over the form and content of an agency's final order, the court as a practical matter lacks the power of judicial review altogether. But the limited power is necessarily implied in the very grant of the power of judicial review, for the reviewing court "must know what a decision means before the duty [arises] to say whether it is right or wrong." *United States v. Chicago, M. St. P. & P.R. Co., supra.* Conversely, it is a ludicrous exercise for a court to attempt to judge the validity of the order when it is not understandable.

(c) Bell's exclusionary policy is justified by reasons of safety, training, work rules and fire codes, which the Commission impliedly found to outweigh the contrary considerations of competition and discrimination;

(d) The difference in charges associated with the two makes of concentrator is based upon length of line installed and used, which is a reasonable ground of distinction in the Commission's judgment; and

(e) "Parity" would be an unreasonable remedy for the anticompetitive and discriminatory effects of which Amtel complains. (This finding apparently has reference to an exposition included by the agency in its final order, setting forth at length the agency's rationale. A part of that rationale includes the judgments that setting rates at "parity" would be a difficult administrative process given all the possible variables involved; "parity" can in any event be only a rough approximation and one of questionable value given the administrative effort and cost involved; and "parity" raises the spectre of "an unending cycle of proceedings to adjust [the applicable] rates to achieve parity where parity is not required" as an administrative policy under PURA.)

In summary, these findings are to the effect that sufficient grounds exist in the Commission's judgment for Bell's exclusionary policy and for not departing from the administrative policy of "distance-sensitive" rates. Even though there are logical defects in several of these findings, they reflect that the Commission did assess the criteria implicit in PURA §§ 38, 45 and 47, to arrive ultimately at a decision that Bell's exclusionary policy and its tariff rates did not combine to constitute a violation of the prohibitions and directives contained in those sections of PURA. Notwithstanding the logical defects, no more was required of the Commission under the opinion of the Supreme Court in *Charter Medical*. We must therefore overrule Amtel's first point of error.

██ 2. *The Commission's final order rests upon policy considerations as op-* *posed to the statutory criteria stated in PURA §§ 38, 45 and 47.* Before turning to the particulars of Amtel's arguments under its second point of error, we should observe generally that "administration" *is ordinarily defined* by the very fact that an agency *is* effectuating policy, primarily the policies settled upon and declared by a legislative body. These legislative policies are commonly expressed, of necessity, in the broadest possible terms, as in PURA § 38 where the Commission is enjoined to "insure that every rate made ... shall be just and reasonable." This is an expression typical of many where the legislature cannot itself make a choice between all possible lines of policy in all possible circumstances that may arise, and it therefore delegates to the agency, by necessary implication, a power to make the final detailed choices by *administrative policies* made within any general policy limits set by the legislature and the purposes behind the statute. Allowing administrative agencies to make and apply policies in its determination of contested cases has both advantages and disadvantages, but it is not forbidden so long as the agency acts within constitutional and statutory limits. *See generally* Landis, *The Administrative Process,* Ch. II, "The Framing of Policies: the Relationship of the Administrative and Legislative" (Greenwood Press 1974); Blachly and Oatman, *Administrative Legislation and Adjudication,* Ch. X, "Advantages of Administrative Adjudication" (Brookings Institution 1934); Jaffe, *Judicial Control of Administrative Action,* at 20–25 (Little, Brown & Co. 1965). Therefore, we must view Amtel's contentions as raising the issue of whether the Commission's final order is within the limits allowed by PURA §§ 38, 45 and 47. (It is not contended that the policies are unconstitutional.)

██ Amtel argues the following: (a) the Commission's findings of fact demonstrate that its decision was based on a Commission policy favoring "distance-sensitive" rates over average rates ("parity") and not upon an analysis of "the evidence

... according to the criteria set out in Sections" 38, 45 and 47; (b) "cost is not a controlling criteria [sic] in setting rates", but the agency assigned controlling effect to that criterion in the present case; and (c) "[t]he Commission does not have discretion to ignore the statutory guidelines" established in PURA §§ 38, 45 and 47. One must agree, of course, with the last named proposition—the Commission was not free to "ignore" the criteria of PURA §§ 38, 45 and 47. One may agree as well with the second proposition that "cost" is not the sole criterion applicable to the case, for the exaggeration of a single criterion of several applicable to the case would constitute reversible error. *Federal Communications Commission v. RCA Communications,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953) (cause remanded to agency for further consideration where its decision rested solely on erroneous theory that competition was the controlling factor in determining "public interest", when competition is feasible).

We are then left with determining whether the Commission considered the factors implicit in PURA §§ 38, 45 and 47; whether it erred in favoring a policy of "distance-sensitive" rates; and whether it exaggerated the cost factor by giving it controlling effect when other factors were made applicable by PURA §§ 38, 45 and 47. We hold the Commission's final order demonstrates that the agency did assess the factors made relevant by those sections of PURA; it did not exaggerate the cost factor; and it acted on a demonstrably reasonable basis in not altering the system of "distance-sensitive" charges for installation and use.

As mentioned previously, the antidiscrimination and antitrust criteria of PURA §§ 38, 45 and 47 are not absolute. The Commission is allowed discretion and judgment in such matters for it is also required under the statute to implement the contraries of those public policies, as discussed at length in the first part of this opinion. Implicit in the Commission's findings of ultimate fact is the proposition that the agency's decision rests upon its considered judgment in adjusting the competing policies in the circumstances of the case.

As correctly pointed out by Amtel, the Commission may make classifications, in a rate proceeding at least, based upon such factors as "the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use *or any other matter which presents a substantial difference as a ground of distinction.*" *Caldwell v. City of Abilene, supra,* (emphasis added); *Texas Alarm & Signal Ass'n v. Public Utility Comm'n, supra.* We may assume that the same principle of *reasonable* classification implies that substantial differences may furnish a basis for other agency action which applies different treatment to different classes or individuals—here Bell and Amtel as competing suppliers of concentrators to telephone-answering services. We will further assume that where substantial differences *do* exist, as grounds of distinction, it is possible that an unreasonable application of the *same* rates may be discriminatory. *See State ex rel. Utilities Commission v. Edmisten,* 291 N.C. 424, 230 S.E.2d 647 (1976). That is, in our view, the issue made by Amtel's contentions in the present case. But *within the zone of reasonableness,* the application of the same rates to those in different circumstances would not be prohibited by any provision of PURA suggested to us.

Here, the agency's findings of ultimate fact include those to the effect that: (a) "parity" would be an unreasonable remedy for reasons pointed out in another part of the agency's final order; and (b) Bell's exclusionary policy is founded upon valid business grounds. Together these suggest in the Commission's judgment that neither Bell's exclusionary policy nor the tariff system of equal rates based upon distance should be altered by the Commission. Such judgments are, of course, committed to agency discretion in the first instance and we are unable to say that the Commission's judgment in such matters lies outside the zone of reasonableness. It pre-

sumably considered that the anticompetitive and discriminatory effects were offset by the deleterious administrative effects of "parity" rates and an administrative requirement that Bell immediately discontinue its exclusionary policy. We overrule Amtel's second point of error.

■ 3. *The Commission's final order is not supported by substantial evidence, and is contrary to law, insofar as it rests upon a determination that the remedies proposed by Amtel would be unlawful.* The "remedies" referred to in this point of error are three alternative suggestions made by Amtel as a means of removing the discrimination and competitive disadvantage suffered by Amtel: (a) "parity" of installation and use charges for the two makes of concentrators; (b) revision of Bell's exclusionary policy to permit the installation of other makes of concentrator in Bell's central offices; or (c) requiring Bell to place its concentrator's outside its central offices. The determination referred to is the Commission's conclusion of law that such remedies would result in rates that are unreasonable, discriminatory, excessive, or insufficient. While Amtel states that this determination is not supported by "substantial evidence," its argument is not "evidentiary" at all. Rather, Amtel argues that the suggested remedies *would not, as a matter of law, have the unlawful effect* attributed to them by the Commission; and, in any event, no findings of basic fact demonstrate such unlawful effect.

Again, we find ourselves controlled by the rather generalized method of judicial review expressed and implied by the decision in *Charter Medical, supra.* We find that the Commission's final order contains findings of ultimate fact implying that Amtel *will* suffer discrimination and competitive disadvantage by reason of the agency's decision not to implement the remedies suggested by Amtel. But, in the agency's view, these ill effects are justified by contrary considerations established by *other* findings of ultimate fact. Again, we may not say that the agency's determination in that regard is outside the zone of reason-

ableness. We have discussed the same matters above and need not repeat them here. We overrule Amtel's point of error.

Finding no error as assigned, we affirm the judgment of the district court.

PHILLIPS, C.J., not participating.

GAMMAGE, Justice, concurring.

I agree that sufficient grounds exist in the Public Utility Commission's findings to sustain its final order; that the Public Utility Commission assessed the relevant criteria established in PURA in arriving at its determination; that the Commission acted reasonably within its discretion based upon its findings regarding these criteria; and that the record of the Commission proceeding contains substantial evidence to support the Commission's finding that Bell's exclusionary policy and tariff rates did not discriminate unlawfully against AMTEL. This is all that is necessary to our review. *Charter Medical-Dallas v. Texas Health Facilities Commission,* 665 S.W.2d 446 (Tex.1984). I therefore concur only in the affirmance of the judgment.